ARO MANUFACTURING CO., INC., ET AL. *v.*
CONVERTIBLE TOP REPLACEMENT
CO., INC.

No. 21.   Argued October 13, 17, 1960.—Decided February 27, 1961.

*David Wolf* argued the cause and filed a brief for petitioners.

*Elliott I. Pollock* argued the cause and filed a brief for respondent.

*Ralph S. Spritzer* argued the cause for the United States, as *amicus curiae,* urging reversal. On the brief were *Solicitor General Rankin, Assistant Attorney General Bicks, Charles H. Weston* and *Richard H. Stern.*

MR. JUSTICE WHITTAKER delivered the opinion of the Court.

On April 17, 1956, respondent, Convertible Top Replacement Co., Inc., acquired a "Territorial Grant" (coextensive with "the Commonwealth of Massachusetts") of all rights in Letters Patent No. 2,569,724, commonly known as the Mackie-Duluk patent, and 10 days later commenced this action against petitioners, Aro Manufacturing Co., Inc., and several of its officers, to enjoin the alleged infringement and contributory infringement of the patent and for an accounting of profits.

The patent—one for a "Convertible Folding Top with Automatic Seal at Rear Quarter"—covers the combination, in an automobile body, of a flexible top fabric, supporting structures, and a mechanism for sealing the fabric against the side of the automobile body in order to keep out the rain. Tops embodying the patent have been installed by several automobile manufacturers in various models of convertibles. The components of the patented combination, other than the fabric, normally are usable for the lifetime of the car, but the fabric has a much

shorter life. It usually so suffers from wear and tear, or so deteriorates in appearance, as to become "spent," and normally is replaced, after about three years of use. The consequent demand for replacement fabrics has given rise to a substantial industry, in which petitioner, Aro Manufacturing Co., is a national leader. It manufactures and sells replacement fabrics designed to fit the models of convertibles equipped with tops embodying the combination covered by the patent in suit.

After trial without a jury, the court held that the patent was valid, infringed and contributorily infringed by petitioners. It accordingly enjoined them from further manufacture, sale or use of these replacement fabrics, and appointed a master to hear evidence concerning, and to report to the court on, the matter of damages. The Court of Appeals affirmed, 270 F. 2d 200, and we granted certiorari, 362 U. S. 902.

The Court of Appeals, after holding that the patent was valid, stated that the "basic question" presented was whether petitioners' conduct constituted "making a permissible replacement of a part [the fabric] which expectedly became worn out or defective sooner than other parts of the patented combination" or whether such replacement constituted "a forbidden reconstruction of the combination." It then held that replacement of the fabric constituted reconstruction of the combination and thus infringed or contributorily infringed the patent. It reached that conclusion principally upon the ground that "the life of the fabric is not so short, nor is the fabric so cheap, that we can safely assume that an owner would rationally believe that in replacing it he was making only a minor repair to his top structure." 270 F. 2d, at 202, 205.

Validity of the patent is not challenged in this Court. The principal, and we think the determinative, question presented here is whether the owner of a combination

patent, comprised entirely of unpatented elements, has a patent monopoly on the manufacture, sale or use of the several unpatented components of the patented combination. More specifically, and limited to the particular case here, does the car owner infringe (and the supplier contributorily infringe) the combination patent when he replaces the spent fabric without the patentee's consent?

The fabric with which we deal here is an unpatented element of respondent's combination patent,[1] which covers only the combination of certain components, one of which is a "flexible top material."[2] The patent makes no claim to invention based on the fabric or on its shape, pattern or design. Whether the fabric or its shape might have been patentable is immaterial,[3] for the fact is that neither the fabric nor its shape has been patented. No claim that the fabric or its shape, pattern or design constituted the invention was made in the application or included in the patent.

Since the patentees never claimed the fabric or its shape as their invention, and the claims made in the patent are the sole measure of the grant,[4] the fabric is no more than an unpatented element of the combination which was

[1] There are 10 claims in the patent. Claims 1 through 9 of the patent each specifically begin: "In a convertible automobile body, the combination of . . . ." Claim 10 does not contain the word "combination" but nevertheless equally claims only a combination.

[2] Among other elements in the claims are the automobile body structure or tonneau, a folding bow structure, a sealing strip, and a wiping arm.

[3] *Graver Mfg. Co.* v. *Linde Co.*, 336 U. S. 271, 277; *Universal Oil Co.* v. *Globe Oil & Refining Co.*, 322 U. S. 471, 484; *Milcor Steel Co.* v. *Fuller Co.*, 316 U. S. 143, 145–146.

[4] *Mercoid Corp.* v. *Mid-Continent Co.*, 320 U. S. 661, 667; *Mercoid Corp.* v. *Minneapolis-Honeywell Co.*, 320 U. S. 680, 684; *McClain* v. *Ortmayer*, 141 U. S. 419, 423–424; *Pennock* v. *Dialogue*, 2 Pet. 1, 16.

claimed as the invention, and the patent did not confer a monopoly over the fabric or its shape. In *Mercoid Corp.* v. *Mid-Continent Co.,* 320 U. S. 661, 667, this Court ruled the point as follows:

"The patent is for a combination only. Since none of the separate elements of the combination is claimed as the invention, none of them when dealt with separately is protected by the patent monopoly."

And in *Mercoid Corp.* v. *Minneapolis-Honeywell Co.,* 320 U. S. 680, 684, the Court said:

"The fact that an unpatented part of a combination patent may distinguish the invention does not draw to it the privileges of a patent. That may be done only in the manner provided by law. However worthy it may be, however essential to the patent, an unpatented part of a combination patent is no more entitled to monopolistic protection than any other unpatented device."

See also *McClain* v. *Ortmayer,* 141 U. S. 419, 423–424; *Pennock* v. *Dialogue,* 2 Pet. 1, 16.

It follows that petitioners' manufacture and sale of the fabric is not a *direct* infringement under 35 U. S. C. § 271 (a).[5] *Cimiotti Unhairing Co.* v. *American Fur Co.,* 198 U. S. 399, 410; *Eames* v. *Godfrey,* 1 Wall. 78, 79; *Prouty* v. *Ruggles,* 16 Pet. 336, 341; *U. S. Industries, Inc.,* v. *Otis Engineering Co.,* 254 F. 2d 198, 203 (C. A. 5th Cir.). But the question remains whether petitioners' manufacture and sale of the fabric constitute a *contributory* infringement of the patent under 35 U. S. C.

---

[5] Section 271 (a) provides:

"Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent."

§ 271 (c).[6]  It is admitted that petitioners know that the purchasers intend to use the fabric for replacement purposes on automobile convertible tops which are covered by the claims of respondent's combination patent, and such manufacture and sale with that knowledge might well constitute contributory infringement under § 271 (c), if, but only if, such a replacement by the purchaser himself would in itself constitute a *direct* infringement under § 271 (a), for it is settled that if there is no *direct* infringement of a patent there can be no *contributory* infringement.   In *Mercoid* v. *Mid-Continent, supra,* it was said: "In a word, if there is no infringement of a patent there can be no contributory infringer," 320 U. S., at 677, and that "if the purchaser and user could not be amerced as an infringer certainly one who sold to him . . . cannot be amerced for contributing to a non-existent infringement." *Id.,* at 674.[7]  It is plain that § 271 (c)—a part of the Patent Code enacted in 1952—made no change in the fundamental precept that there can be no contributory infringement in the absence of a direct infringement.   That section defines contributory infringement in terms of direct infringement—namely the sale of a component of a

---

[6] Section 271 (c) is as follows:

"Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use *in an infringement of such patent,* and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer." (Emphasis added.)   .

[7] Although these statements were made in the dissenting opinions of MR. JUSTICE FRANKFURTER and Mr. Justice Roberts, respectively, there is nothing in the majority opinion remotely suggesting any disagreement with the fundamental conclusion that there can be no contributory infringement in the absence of direct infringement.

patented combination or machine for use "in an infringement of such patent." And § 271 (a) of the new Patent Code, which defines "infringement," left intact the entire body of case law on direct infringement.[8] The determinative question, therefore, comes down to whether the car owner would infringe the combination patent by replacing the worn-out fabric element of the patented convertible top on his car, or even more specifically, whether such a replacement by the car owner is infringing "reconstruction" or permissible "repair."

This Court's decisions specifically dealing with whether the replacement of an unpatented part, in a patented combination, that has worn out, been broken or otherwise spent, is permissible "repair" or infringing "reconstruction," have steadfastly refused to extend the patent monopoly beyond the terms of the grant. *Wilson* v. *Simpson*, 9 How. 109—doubtless the leading case in this Court that deals with the distinction—concerned a patented planing machine which included, as elements, certain cutting knives which normally wore out in a few months' use. The purchaser was held to have the right to replace those knives without the patentee's consent. The Court held that, although there is no right to "rebuild" a patented combination, the entity "exists" notwithstanding the fact that destruction or impairment of one of its elements renders it inoperable; and that, accordingly, replacement of that worn-out essential part is permissible restoration of the machine to the original use for which it was bought. 9 How., at 123. The Court explained that it is "the use of the whole" of the

---

[8] The reviser's note on § 271 (a) specifically stated that it is "declaratory only." 35 U. S. C. A., following § 271.

"The prior statute had no section defining or dealing with what constitutes infringement of a patent," and § 271 (a) was adopted "for completeness." Federico, *Commentary on the New Patent Act,* 35 U. S. C. A., preceding § 1, at p. 51.

combination which a purchaser buys, and that repair or replacement of the worn-out, damaged or destroyed part is but an exercise of the right "to give duration to that which he owns, or has a right to use as a whole." *Ibid.*[9]

The distilled essence of the *Wilson* case was stated by Judge Learned Hand in *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 425 (C. A. 2d Cir.): "The [patent] monopolist cannot prevent those to whom he sells from . . . reconditioning articles worn by use, unless they in fact make a new article." Instead of applying this plain and practical test, the courts below focused attention on operative facts not properly determinative of the question of permissible repair *versus* forbidden reconstruction. The Court of Appeals found that the fabric "is not a minor or relatively inexpensive component" of the patented combination, or an element that would expectedly wear out after a very short period of use—although its "expectable life span" is shorter than

---

[9] None of this Court's later decisions dealing with the distinctions between "repair" and "reconstruction" have added to the exposition made in *Wilson* v. *Simpson, supra,* and that opinion has long been recognized as the Court's authoritative expression on the subject. *Morgan Envelope Co.* v. *Albany Paper Co.,* 152 U. S. 425, and *Heyer* v. *Duplicator Mfg. Co.,* 263 U. S. 100, held that an owner or licensee of a patented machine or combination does not infringe the patent by replacing an unpatented element of the combination which has only a temporary period of usefulness, so that replacement is necessary for continued utilization of the machine or combination as a whole. Those cases came clearly within the *Wilson* case. *Cotton-Tie Co.* v. *Simmons,* 106 U. S. 89, the only other repair-reconstruction case decided by this Court since *Wilson,* found infringement by one who bought up, as scrap metal, patented metal straps, used in tying cotton bales, after the straps had been used and severed (in unbinding the bales), and who then welded or otherwise reconnected the straps at the severed point and resold them for further use in baling cotton. The case is distinguishable on its facts, and the fact that the ties were marked "Licensed to use once only," was deemed of importance by the Court. Cf. *Henry* v. *A. B. Dick Co.,* 224 U. S. 1.

that of the other components—and, for these reasons, concluded that "an owner would [not] rationally believe that . . . he was making only a minor repair" in replacing the worn-out fabric, but that, instead, the replacement "would be counted a major reconstruction." 270 F. 2d, at 205. We think that test was erroneous.

Respondent has strenuously urged, as an additional relevant factor, the "essentialness" of the fabric element to the combination constituting the invention. It argues that the particular shape of the fabric was the advance in the art—the very "heart" of the invention—which brought the combination up to the inventive level, and, therefore, concludes that its patent should be held to grant it a monopoly on the fabric. The rule for which respondent contends is: That when an element of a patented machine or combination is relatively durable—even though not so durable as the entire patented device which the owner purchased—relatively expensive, relatively difficult to replace, and is an "essential" or "distinguishing" part of the patented combination, any replacement of that element, when it wears out or is otherwise spent, constitutes infringing "reconstruction," and, therefore, a new license must be obtained from, and another royalty paid to, the patentee for that privilege.

We cannot agree. For if anything is settled in the patent law, it is that the combination patent covers only the totality of the elements in the claim and that no element, separately viewed, is within the grant. See the *Mercoid* cases, *supra,* 320 U. S., at 667; 320 U. S., at 684.[10] The basic fallacy in respondent's position is that it requires the ascribing to one element of the patented com-

---

[10] Although the *Mercoid* cases involve the doctrine of patent misuse, which is not an issue in this case, they also specifically delimit the character of a combination patent monopoly and it is upon that matter that they are relevant here.

bination the status of patented invention in itself. Yet this Court has made it clear in the two *Mercoid* cases that there is no legally recognizable or protected "essential" element, "gist" or "heart" of the invention in a combination patent. In *Mercoid Corp.* v. *Mid-Continent Co., supra,* the Court said:

> "That result may not be obviated in the present case by calling the combustion stoker switch the 'heart of the invention' or the 'advance in the art.' The patent is for a combination only. Since none of the separate elements of the combination is claimed as the invention, none of them when dealt with separately is protected by the patent monopoly." 320 U. S., at 667.

And in *Mercoid Corp.* v. *Minneapolis-Honeywell Co., supra,* the Court said:

> "The fact that an unpatented part of a combination patent may distinguish the invention does not draw to it the privileges of a patent. That may be done only in the manner provided by law. However worthy it may be, however essential to the patent, an unpatented part of a combination patent is no more entitled to monopolistic protection than any other unpatented device." 320 U. S., at 684.

No element, not itself separately patented, that constitutes one of the elements of a combination patent is entitled to patent monopoly, however essential it may be to the patented combination and no matter how costly or difficult replacement may be. While there is language in some lower court opinions indicating that "repair" or "reconstruction" depends on a number of factors, it is significant that each of the three cases of this Court, cited for that proposition, holds that a license to use a patented combination includes the right "to preserve its fitness for use so far as it may be affected by wear or breakage."

*Leeds & Catlin Co.* v. *Victor Talking·Machine Co.,* 213 U. S. 325, 336; *Heyer* v. *Duplicator Mfg. Co., supra,* at 102; and *Wilson* v. *Simpson, supra,* at 123. We hold that maintenance of the "use of the whole" of the patented combination through replacement of a spent, unpatented element does not constitute reconstruction.

The decisions of this Court require the conclusion that reconstruction of a patented entity, comprised of unpatented elements, is limited to such a true reconstruction of the entity as to "in fact make a new article," *United States* v. *Aluminum Co. of America, supra,* at 425, after the entity, viewed as a whole, has become spent. In order to call the monopoly, conferred by the patent grant, into play for a second time, it must, indeed, be a second creation of the patented entity, as, for example, in *Cotton-Tie Co.* v. *Simmons, supra.* Mere replacement of individual unpatented parts, one at a time, whether of the same part repeatedly or different parts successively, is no more than the lawful right of the owner to repair his property. Measured by this test, the replacement of the fabric involved in this case must be characterized as permissible "repair," not "reconstruction."

*Reversed.*

Mr. Justice Black, concurring.

I fully concur in the judgment of reversal and with the opinion of the Court but want to express some additional views because of the concurring opinion of my Brother Brennan and the dissenting opinion of my Brother Harlan. The latter two opinions, in my judgment, attempt to introduce wholly unnecessary and undesirable confusions, intricacies and complexities into what has been essentially a very simple question under the opinions of this Court, and that is: How can a court decide whether a person who has bought and owns a patented commodity composed of a combination of unpatented

elements is actually making a new one so as to infringe the patent, rather than merely replacing a worn-out part or parts necessary to continue the use of the commodity, which does not constitute patent infringement? I put the question as one of direct infringement because I agree with the other three opinions in this case that the petitioner Aro Manufacturing Co. here who cut out and sold fabrics to replace worn-out covers in patented automobile tops can be guilty of *contributory* infringement only if automobile owners who buy the fabrics and use them in their own cars are themselves guilty of *direct* infringements and liable for treble damages.[1]   The crucial question here therefore is one of direct, not contributory, infringement.   For this reason it seems to me that most of the talk in the case about contributory infringement and misuse of patents is confusing and beside the point.   For the same reason the emphasis in this Court, the District Court and the Court of Appeals on the recodification [2] of the patent laws in 1952 seems to me to be out of place. The language and history of that Act show plainly:

[1] This elementary principle was brought to the attention of Congress by Mr. Giles S. Rich, the chief draftsman of the provisions on contributory infringement in the 1952 recodification:

"Mr. RICH. . . . I should state at the outset that wherever there is contributory infringement there is somewhere something called direct infringement, and to that direct infringement someone has contributed.   It is a very different thing from a concept like contributory negligence."   Hearings before Subcommittee of House Judiciary Committee on H. R. 3760, 82d Cong., 1st Sess. 151 (1951).

[2] If anyone is inclined despite other evidence to the contrary to attribute to Congress a purpose to accomplish any far-reaching changes in the substantive law by this enactment, he should take note that just before the bill was passed in the Senate, Senator Saltonstall asked on the floor, "Does the bill change the law in any way or only codify the present patent laws?"   Senator McCarran, Chairman of the Judiciary Committee which had been in charge of the bill for the Senate, replied, "It codifies the present patent laws."   98 Cong. Rec. 9323 (July 4, 1952).

(1) that Congress wanted to continue in force, but not expand, the judge-made doctrine of contributory infringement under which a person who knowingly aids, encourages or abets the direct infringement of a patent is to be held liable as a contributory infringer; [3] (2) that Congress

[3] To this end, the 1952 Act provides (35 U. S. C. § 271):

"(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

"(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, shall be liable as a contributory infringer."

The hearings and committee reports show that the only purpose of these provisions was to prevent this Court's decision in *Mercoid Corp.* v. *Mid-Continent Inv. Co.*, 320 U. S. 661, from being treated as having obliterated the law of contributory infringement:

"Mr. ROGERS. Then I take it from your statements, that there is some difference of opinion among those engaged in the practice of patent law as to whether or not the Supreme Court in its decisions has done away with contributory infringement.

. . . . .

"Mr. RICH. There is a great difference of opinion on the part of the bar and also apparently on the part of the judiciary . . . .

"Mr. ROGERS. Then in effect this recodification, particularly as to section 231 [from which came the present § 271], would point out to the court, at least that it was the sense of Congress that we remove this question of confusion as to whether contributory infringement existed at all, and state in positive law that there is such a thing as contributory infringement, or at least it be the sense of Congress by the enactment of this law that if you have in the Mercoid case done away with contributory infringement, then we reinstate it as a matter of substantive law of the United States and that you shall hereafter in a proper case recognize or hold liable one who has contributed to the infringement of a patent.

"That is the substantive law that we would write if we adopted this section 231 as it now exists. Is that not about right?

"Mr. RICH. That is a very excellent statement . . . ." Hearings, *supra,* note 1, at 159. [*Footnote 3 continued on p. 349.*]

did not want patentees to be barred from prosecuting their claims for direct infringement merely because they exercised their right to assert a claim in or out of court for contributory infringement; [4] (3) that the long-existing scope of a patentee's monopoly rights was not to be expanded

". . . Considerable doubt and confusion as to the scope of contributory infringement has resulted from a number of decisions of the courts in recent years. The purpose of this section is to codify in statutory form principles of contributory infringement and at the same time eliminate this doubt and confusion." H. R. Rep. No. 1923 on H. R. 7794, 82d Cong., 2d Sess. 9.

[4] To protect a patentee's right to sue for contributory infringement, the 1952 Act provides:

"(d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement." 35 U. S. C. § 271 (d).

This provision was designed specifically to prevent the *Mercoid* case from being interpreted to mean that any effort to enforce a patent against a contributory infringer in itself constitutes a forfeiture of patent rights:

"Mr. RICH. . . .

"Other decisions following Mercoid have made it quite clear that at least some courts are going to say that any effort whatever to enforce a patent against a contributory infringer is in itself misuse. The cases are cited in the old hearings. Therefore, we have always felt— we who study this subject particularly—that to put any measure of contributory infringement into law you must, to that extent and to that extent only, specifically make exceptions to the misuse doctrine, and that is the purpose of paragraph (d)." Hearings, *supra,* note 1, at 161–162.

". . . The last paragraph of this section provides that one who merely does what he is authorized to do by statute is not guilty of misuse of the patent." H. R. Rep. No. 1923, *supra,* note 3, at 9.

beyond what it had always been, that is, the exclusive right to make, use or sell a patented invention during the life of the patent.[5]    The present case, therefore, narrows down to this and no more: Is the making or the use of a new piece of fabric to replace the worn-out fabric cover of an automobile top attached to an automobile that the owner has bought and paid for as his own an infringement of a patent on that top?   Note immediately that if it is an infringement it must be because the owner of the top, in doing nothing but replacing the worn-out fabric, "makes" the patented invention which is the top with all its parts.   Common sense and prior decisions of this Court require us to hold that an automobile owner does not "make" a whole top when he merely replaces its worn-out fabric cover.

Let us first take a quick look at the top described in the patent.   It is composed first and foremost of a metal frame, no part of which is, or could have been, patented. It also includes several other pieces of metal, one of them called a "wiper," which is simply a plain piece of metal that is not and could not have been patented.   Again,

---

[5] The 1952 Act carried out this purpose by providing:

"(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent."   35 U. S. C. § 271 (a).

Although there was no statutory provision defining infringement prior to 1952, the definition adopted is consonant with the long-standing statutory prescription of the terms of the patent grant, which was contained in § 4884 of the Revised Statutes as follows:

"Every patent shall contain a short title or description of the invention or discovery, correctly indicating its nature and design, and a grant to the patentee . . . of *the exclusive right to make, use, and vend the invention or discovery* throughout the United States . . . ." (Emphasis supplied.)

This provision is now contained without substantial change in 35 U. S. C. § 154.

there is a piece of fabric cut in a certain shape to fit and cover the unpatented frame. Of course this fabric could not be patented unless it had some peculiar novel quality of its own, but no such characteristic is or could have been claimed. The District Court held that this aggregation of nonpatentable parts was patentable as achieving a new result. The Court of Appeals, without passing on this question at all, merely took it for granted that a patentable "discovery" had been made. I shall also act on that assumption although I am not sure in just what respect the aggregation of these common components could possibly have served a new purpose or have been the result of anything more than the simplest childlike mechanical skill. In fact, the patentee must have known all about the old-fashioned surrey with the fringe on top and with isinglass curtains you could roll right down in case of a change in the weather. The top is also reminiscent of the tops of Model T Fords which began to scare horses on country roads nearly half a century ago. A reading of the record indicates that the new discovery might be thought to inhere in the fact that (a) this top protects from rain better than any that had previously been manufactured, (b) it could be made rainproof from the inside rather than requiring some one to get outside and manipulate snaps, or (c) the folding material is fastened "below the top of the tonneau" and "a wiping arm automatically operated by the bow structure [is used] for wiping the inside of the folding material as the top is raised and pressing it against the top of the tonneau." None of these alleged additions to the present stock of surrey and Tin Lizzie knowledge, however, gives us much aid in determining the real issue being decided here, which is whether replacing the fabric amounts to the "making" of a new top and thus a direct infringement of the patent. It is of importance in considering this question that the District Court found, and

the Court of Appeals agreed, that the only thing the defendant made was the fabric portions of convertible tops. Certainly I suppose it would not be claimed that the sale of unshaped woolen fabric—a staple article of commerce—would make a tailor or merchant guilty of contributory infringement if he sold it to the owner of a pair of patented trousers for patching purposes. But evidently the contention is that when petitioner here put his scissors or whatever cutting instrument he used on the fabric and shaped it so that it would fit the top, he was thereby aiding the top's owner to "make" a new top, or at least to "reconstruct" one from the ground up. Nothing in any of the prior cases of this Court indicates that such a contention should be sustained.

The case that may well be classified as the leading one on the subject of "making" or "reconstruction" as distinguished from "repair" is *Wilson* v. *Simpson,* 9 How. 109, decided in 1850. That case involved a patent on a planing machine composed of unpatented parts described as the frame, the cogwheels, the shaft, and other elementary parts, which, when put together, constituted what was known as the "Woodworth planing-machine." Able counsel argued for the patentee that the cutting knives, which had to be replaced from time to time, could not be replaced without thereby infringing the patent. The contention was that the machine ceased to exist or have any "material existence" the moment its knives wore out, and that for this reason replacement of the knives amounted to a "making" of the whole patented invention which infringed the patentee's exclusive right to "make, use, and vend." The Court refused to accept this conceptualistic and misleading argument as to when a tangible machine ceases to have a "material existence." It did agree that "when the material of the combination ceases to exist, in whatever way that may occur, the right to

renew it depends upon the right to make the invention. If the right to make does not exist, there is no right to rebuild the combination." *Id.,* at 123. But the Court then went on to enunciate what has been the accepted rule in this Court ever since with respect to component parts of the combination: "When the wearing or injury is partial, then repair is restoration, and not reconstruction. . . . And it is no more than that, though it shall be a replacement of an essential part of a combination." *Ibid.*

In further explanation the Court pointed out that "[f]orm may be given to a piece of any material,—wood, metal, or glass,—so as to produce an original result, or to aid the efficiency of one already known, and that would be the subject for a patent." It went on to say that if that patented article should happen to be broken so that its parts could not be readjusted or so worn out and beyond repair as to be wholly useless, then a purchaser could not make another to replace it without infringing, but would have to buy a new one. This because the Court said that would amount to an "entire reconstruction" of the patented article. "If, however," and this is of crucial importance with reference to the combination patent in the present case, "this same thing is a part of an original combination, essential to its use, then the right to repair and replace recurs." *Id.,* at 124.

The common-sense rule of *Wilson* v. *Simpson* was followed in *Heyer* v. *Duplicator Mfg. Co.,* 263 U. S. 100. Involved there was a combination patent, a multiple copying machine, "one element of which," the Court said, "is a band of gelatine to which is transferred the print to be multiplied and which yields copies up to about a hundred. This band is attached to a spool or spindle which fits into the machine. Anyone may make and sell the gelatine composition but the ground of recovery was that the de-

fendant made and sold bands of sizes fitted for use in the plaintiff's machine and attached them to spindles, with intent that they should be so used. The main question is whether purchasers of these machines have a right to replace the gelatine bands from any source that they choose. If they have that right the defendant in selling to them does no wrong." *Id.,* at 101. A unanimous Court, speaking through Mr. Justice Holmes, recognized that the rule of *Wilson* v. *Simpson* disposed of this question, saying that "[s]ince *Wilson* v. *Simpson,* 9 How. 109, 123, it has been the established law that a patentee has not 'a more equitable right to force the disuse of the machine entirely, on account of the inoperativeness of a part of it, than the purchaser has to repair, who has, in the whole of it, a right of use.' " 263 U. S., at 101. Like the bands of gelatine in *Heyer,* the fabric in the present case is a common article of commerce, and also like the gelatine it has to have a special form to fit into the combination.

None of this Court's cases relied upon by my Brothers HARLAN and BRENNAN justifies adoption of the supposed guides and standards referred to in their opinions. Deciding whether a patented article is "made" does not depend on whether an unpatented element of it is perishable, or how long some of the elements last, or what the patentee's or a purchaser's intentions were about them, regardless of whether the application of such standards is considered a question of law, as it is by MR. JUSTICE BRENNAN, or a question of fact, as it is by MR. JUSTICE HARLAN. The holdings of prior cases in this Court have not actually rested on such minor and insignificant factors in determining when an article has been "made" and when it has not. A case in which only a minimal component has been omitted from a "making" of the combination, such as the extreme example of omission of a single bolt from a patented machine or a button from a patented garment, might call upon this Court to articulate some rather ob-

vious refinements to this simple test of "making." [6] But this is by no means such a case and it is dangerously misleading to suggest that so clear a case as this one requires the application of a Pandora's flock of insignificant standards, especially when it is recognized, as it must be upon analysis, that consistent application of the standards suggested would actually change the basic test from "making" to something not satisfactorily defined but indisputably different. And surely the scope of a patent should never depend upon a psychoanalysis of the patentee's or purchaser's intentions, a test which can only confound confusion.[7] The common sense of the whole matter is, as recognized in the *Wilson* case and again in the opinion of the Court today, that in none but the most extraordinary case—difficult even to imagine—will a court ever have to invoke specially contrived evidentiary standards to determine whether there has actually been a new "making" of the patented article.

Neither *Leeds & Catlin Co.* v. *Victor Talking Machine Co.*, 213 U. S. 325, nor *Cotton-Tie Co.* v. *Simmons,* 106 U. S. 89, nor any other cases of this Court that have treated this subject, depart from this common-sense rule of *Wilson* v. *Simpson.* In fact, as Mr. Justice Holmes pointed out in *Heyer* v. *Duplicator Mfg. Co., supra,* the question in *Leeds & Catlin* did not concern "a right to sub-

---

[6] This point was made by Mr. Rich in the course of the hearings as follows: "If the part he is supplying is *in substance the very thing which was invented,* it seems to me personally, that he is an infringer, and he should not be let off on some little technicality that there is *something minor in the whole apparatus that he is not supplying."* Hearings, *supra,* note 1, at 153. (Emphasis supplied.) Of course, as Mr. Rich well knew, "the very thing" which is invented in any combination patent is the combination itself and not any unpatented component part of it—in this case, the whole convertible top, not the fabric used in it.

[7] Cf. *Mercoid Corp.* v. *Mid-Continent Inv. Co.,* 320 U. S. 661, 679–680 (Jackson, J., dissenting on other grounds).

356

stitute worn out parts" and "[t]he authority of *Wilson* v. *Simpson* and the cases that have followed it was fully recognized [in *Leeds & Catlin*] and must be recognized here." 263 U. S., at 102. The *Cotton-Tie* case likewise contains no support for holding that replacing the fabric in this top amounts to a "making" or even a "remaking" of the whole convertible top. The patent involved there was a cotton bale tie. Marked on each, for whatever it was worth, was "Licensed to use once only." After these ties had been used once and broken off the cotton bales, the old tie material, along with the buckles, was sold as scrap, then re-rolled, straightened, riveted together, and cut into proper lengths and attached to an old buckle. It was this making of completely new ties out of the discarded scrap material that was held to amount to a making of the patented device and therefore an infringement.[8] Cf. *Morgan Envelope Co.* v. *Albany Paper Co.,* 152 U. S. 425, 433–434. *Morgan Envelope,* in addition to its distinction of the *Cotton-Tie* case, is notable for its explicit reaffirmance of *Wilson* v. *Simpson* and for its statement by a unanimous Court that "[t]he true distinction" is whether the component part of the combination is "the subject of a separate patent." 152 U. S., at 435. I agree with my Brother WHITTAKER that this remains the true distinction today.[9]

---

[8] See Transcript of Record, pp. 29–33, *Cotton-Tie Co.* v. *Simmons,* 106 U. S. 89.

[9] I am perfectly content with the dissenting opinion's denomination of our interpretation as a "reconstruction" of the cases in the sense in which I understand that term to be applied in these cases. I regret to say, however, that we cannot claim this interpretation to be a "discovery" in the patent sense. It was anticipated by Judge Learned Hand's citation of *Wilson* v. *Simpson* for the proposition that "[t]he [patent] monopolist cannot prevent those to whom he sells from . . . reconditioning articles worn by use, unless they in fact make a new article." *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 425.

In my judgment it would create mischievous results for a majority of this Court to create or approve ambiguous evidentiary standards which could only obfuscate the simple fact of whether a person is "making" a patented article composed of old unpatentable elements. For example, there should be no attempt to decide whether there is a making by comparing the time that the different elements of such a patent normally will exist if let alone. The owner is under no obligation to let them alone. Every owner has the right to repair and patch each part of the property he bought and paid for in order to make it last as long as he can. Everyone knows that this patented top is likely to last as long as the car itself if it is repaired from time to time. An accident might wholly destroy the entire top and then it might have to be replaced by a new one, which if done without the patentee's consent would of course be an infringement. I cannot suppose, however, that if the bows upon which the fabric rests at the top, or the metal frames upon which it stands, or the metal wiper which helps to level off the curtain folds, or the snaps that may have to be used, should happen to become worn out or destroyed, that anyone could reasonably come to the conclusion that a replacement of one of these worn-out parts would be a complete rebuilding of the old top or the "making" of a new one and therefore an infringement of the patent. Such a contention would seem little short of fantastic to me, and the same is true as to replacement of the fabric.

This case is of great importance in our competitive economy. The record shows that petitioner is but one of many small business enterprises filling a useful place in manufacturing the comparatively smaller parts of larger products like automobiles. It is quite right and in keeping with our patent system that small business enterprises should no more than large enterprises be allowed to

infringe the patents of others. But businessmen are certainly entitled to know when they are committing an infringement. It is for that reason that the patent statutes require applicants to define with particularity and claim without ambiguity the subject matter which is regarded to be an invention. 35 U. S. C. §§ 112, 154. In the absence of suits like this how could à businessman even suspect that he might be infringing a patent by marketing an unpatented and unpatentable part of a combination like this fabric top? It has long been settled with respect to combination patents that the monopoly rights extend only to the patented combination as a whole and that the public is free to appropriate any unpatented part of it, "however important." *Special Equipment Co.* v. *Coe,* 324 U. S. 370, 376, and cases cited. And in the 1952 recodification Congress was very careful, in what is now 35 U. S. C. § 271 (c), to specify that a vendor is liable as a contributory infringer only if he has sold the component part "knowing" that it is to be used in an infringement.[10] But to what avail these congressional precautions if this Court, by its opinions, would subject small businessmen to the devastating uncertainties of nebulous and permissive standards of infringement under which courts could impose treble damages upon them for making parts, distinct, separable, minor parts, or even major parts of a combination patent, upon which parts no patent has been or legally could have been issued. The fact that subjection of a small business enterprise to treble damages for such activities can have disastrous or even lethal consequences is suggested by the observation of the

---

[10] If the wording of the statutory provision be thought to leave any doubt on this point, the intent of Congress is made manifest by the fact that the position of the word "knowing" (originally "knowingly") in subsection (c) was changed after the hearings for this very purpose. See Hearings, *supra,* note 1, at 13, 142, 164, 176.

District Court in this very case that petitioner had not made a supersedeas bond, whether because unable or unwilling to do so the court said it was not informed. The efforts of Congress to help small business enterprises keep their heads above water in the Small Business Act of 1953,[11] which was enacted almost contemporaneously with the recodification of the patent laws, could be frustrated at least in large part by subjecting those engaged in industrial activities to the constantly overhanging threat of suits for patent infringements for the sale of unpatented articles. And I think it is indisputable that the unpredictability in any given case of the resolution of the intricate standards suggested by my Brothers HARLAN and BRENNAN would deter small businessmen from engaging even in activities that all members of this Court would ultimately agree do not constitute contributory infringement. In our own case these standards led to opposite conclusions when applied by three distinguished judges of the Court of Appeals and when applied by MR. JUSTICE BRENNAN.

The established policy in this Nation for more than a century has been that when an article described in a patent is sold and "passes to the hands of the purchaser, it is no longer within the limits of the monopoly. It passes outside of it, and is no longer under the protection of the act of congress. . . . Contracts in relation to it are regulated by the laws of the State, and are subject to state jurisdiction." [12] In this day of advanced technology and mechanical appliances upon which so many people depend,

---

[11] 67 Stat. 232, as amended, 15 U. S. C. §§ 631–651.

[12] *Bloomer* v. *McQuewan,* 14 How. 539, 549–550; see *United States* v. *Univis Lens Co.,* 316 U. S. 241, 251, and cases collected in *General Talking Pictures Corp.* v. *Western Electric Co.,* 305 U. S. 124, 128, note 1 (dissenting opinion). This century-long mandate cannot be set aside because of what my Brother HARLAN now conceives to be a more enlightened policy in this field of law.

this wise policy against permitting patentees to expand their control of commodities after they reach the hands of bona fide purchasers is all the more important. Congress surely did not intend for it to be left within the sole discretion of the patent monopolist whether an unpatented component part will be separately available to the purchaser for replacement in the combination or whether, when that part wears out, the purchaser will be forced to replace a larger subcombination of the patented product or perhaps even the entire aggregation. I have an idea it would greatly surprise and shock the owners of convertible automobiles throughout this country to learn that there is a serious contention made that if they buy a new fabric to replace the worn-out fabric on their convertible top, loose legal formulas like those suggested by my Brothers HARLAN and BRENNAN can be applied to make them liable for treble damages, attorneys' fees and heavy costs. No such doctrine should be allowed to gain a foothold through judicial decisions. If bona fide purchasers of goods throughout the Nation are to be subjected to any such phenomenal expansion of the right of patentees, Congress, not this Court, should do it. One royalty to one patentee for one sale is enough under our patent law as written. And this proposition can be stated with knowledge that there is not a single sentence, clause, phrase or word in the entire legislative history of the 1952 recodification which could have led Congress to believe that it was being asked by means of the provisions enacted to enlarge the scope of a patentee's exclusive right to "make, use, and vend" the thing patented.

A fundamental error underlying the misleading standards suggested by my Brothers HARLAN and BRENNAN is the notion that in a case of this kind a court is obliged to search for the alleged "heart" or "core" of the combination patent. This misconception, which has unequivo-

cally been rejected in our prior decisions,[13] is nothing but an unwarranted transformation and expansion of a combination patent, which was correctly described by Mr. Justice Jackson as conferring only a "... right in an abstruse relationship between things in which individually there is no right." [14]  A patented combination is no more than that, a novel relationship brought to bear on what presumably are familiar elements already in the public domain.  Such familiar elements are not removed from the public domain merely because of their use, however crucial, in the novel combination.  Of course, if novelty should inhere in one of the parts as well as in the whole, then that novel "heart" or "core" can be separately patented and separately protected.  But in the absence of such a separate patent, which  in this case would presumably be some sort of patent on the utility of the shape of the fabric, the public has the right to make, use and vend each part subject only to the established limitation of contributory infringement: that a part may not be knowingly supplied for use by an unauthorized person in a new making of what is in effect the whole combination.

Finally, petitioners point out that there is a serious constitutional question involved in the claim that automobile owners can be mulcted for damages for replacing the worn-out fabric in their convertible tops.  Article I, § 8 of the Constitution provides:

> "The Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

---

[13] See *Mercoid Corp.* v. *Mid-Continent Inv. Co.*, 320 U. S. 661, 667–668, and cases cited.

[14] *Id.*, at 679 (dissenting opinion).

I have no doubt of the wide powers of the States to govern the sale of fabrics, clipped or unclipped, cut or uncut, cloth, oilcloth, isinglass or plastic.   But it is difficult for me to think that shaping up a common piece of fabric with a common pair of scissors or other cutter can be exalted to that important category of "Discoveries" that the Constitution authorizes Congress to promote by special federal legislation.   Nor do I believe that a purpose should be attributed to Congress to allow the courts, by means of an incalculable weighing of a complex of nebulous standards, to divine whether persons should be given monopoly rights on account of the way they trim ordinary fabrics.   If there is anything sure about the 1952 recodification it is that the purpose was to clarify not to confuse the law. The test applied in the opinion of the Court today will not confuse, is in accord with our prior decisions endorsed by Congress and, most important, is in keeping with the general purposes of this Nation to retain an economy in which competition is a general law of trade except where actual "Discoveries" have been made.

MR. JUSTICE BRENNAN, concurring in the result.

I agree that the replacement of the top was "repair" and not "reconstruction," but I cannot agree that the test suggested by my Brother WHITTAKER for determination of that question is the correct one.   My Brother HARLAN's dissent cogently states the reasons why I also think that is too narrow a standard of what constitutes impermissible "reconstruction."   For there are circumstances in which the replacement of a single unpatented component of a patented combination short of a second creation of the patented entity may constitute "reconstruction." *Leeds & Catlin Co.* v. *Victor Talking Machine Co.,* 213 U. S. 325; *Davis Electrical Works* v. *Edison Electric Light Co.,* 60 F. 276; cf. *Williams* v. *Hughes Tool Co.,* 186 F. 2d 278. These holdings applied the long-established standard for

.determination of "repair" or "reconstruction." Under that standard there is no single test to which all must yield; rather the determination is to be based upon the consideration of a number of factors. *Wilson* v. *Simpson,* 9 How. 109; *Heyer* v. *Duplicator Mfg. Co.,* 263 U. S. 100.[1] Appropriately to be considered are the life of the part replaced in relation to the useful life of the whole combination,[2] the importance of the replaced element to

---

[1] The standard has been variously expressed. See, *e. g.,* "Whether the bounds of legitimate repair have been exceeded must be determined upon the facts of each case as it is presented." *Morrin* v. *Robert White Engineering Works,* 143 F. 519, 520. "In the absence of a crucial test to which all must yield, the only aid comes from various minor or incidental considerations, and their combined effect." *Davis Electrical Works* v. *Edison Electric Light Co.,* 60 F. 276, 280. "The right, in our view, must depend in every case upon the special facts of the case as they show the relation of the two classes of parts—those supplied and those remaining in the original construction—to the patented unit. . . . there might be a structure where the putting in of a certain number of new parts would be 'reconstruction,' whereas the putting in of a smaller number would be 'repair,' or even where the putting in of one new part would be reconstruction but the putting in of two or three would not be, depending in each case upon whether, after the replacement, the structure as a whole could reasonably be said to be a new structure or the old one." *Automotive Parts Co.* v. *Wisconsin Axle Co.,* 81 F. 2d 125, 127. "Each case, as it arises, must be decided in the light of all the facts and circumstances presented, and with an intelligent comprehension of the scope, nature, and purpose of the patented invention, and the fair and reasonable intention of the parties." *Goodyear Shoe Machinery Co.* v. *Jackson,* 112 F. 146, 150. "The dividing line between repairs and a making over cannot be verbally located. What has been done can with more or less confidence be pronounced to be one or the other, but neither the one nor the other can be defined." *Hess-Bright Mfg. Co.* v. *Bearings Co.,* 271 F. 350, 352.

[2] *Wilson* v. *Simpson, supra; Heyer* v. *Duplicator Manufacturing Co., supra; Williams* v. *Barnes,* 234 F. 339; *Micromatic Hone Corp.* v. *Mid-West Abrasive Co.,* 177 F. 2d 934; *Payne* v. *Dickinson,* 109 F. 2d 52; *El Dorado Foundry, Machine & Supply Co.* v. *Fluid Packed Pump Co.,* 81 F. 2d 782; *Slocomb & Co., Inc.,* v. *Layman*

364

the inventive concept,[3] the cost of the component relative to the cost of the combination,[4] the common sense understanding and intention of the patent owner and the buyer of the combination as to its perishable components,[5] whether the purchased component replaces a worn-out part or is bought for some other purpose,[6] and other pertinent factors.[7]

---

*Machine Co.*, 227 F. 94, affirmed, 230 F. 1021. In the *Slocomb* case the Court said, 227 F., at p. 98: "If . . . patented mechanism be composed of various parts and elements the most expensive of which have an average life of twenty years, and other parts or features of comparatively trifling cost are subjected in the operation of the mechanism to such wear as to require renewal or replacement within a period of a few months, or of a year or two, it would seem reasonable and sensible to treat such renewal or replacement as involving repairs in contradistinction to reconstruction."

[3] *Leeds & Catlin Co.* v. *Victor Talking Machine Co.*, *supra; Davis Electrical Works* v. *Edison Electric Light Co.*, *supra*, "in certain stages of use the essence of a device, though in appearance only a small portion of it, may be lost, and its renewal amount to reconstruction." Pp. 279–280. *Morrin* v. *Robert White Engineering Works*, *supra*, p. 519.

[4] *Heyer* v. *Duplicator Mfg. Co.*, *supra; American Safety Razor Corp.* v. *Frings Bros. Co.*, 62 F. 2d 416; *El Dorado Foundry, Machine & Supply Co.* v. *Fluid Packed Pump Co.*, *supra; Slocomb & Co., Inc.*, v. *Layman Machine Co.*, *supra*.

[5] *Westinghouse Elec. & Mfg. Co.* v. *Hesser*, 131 F. 2d 406, 410: "Where the perishable nature of the parts are recognized by the patentee, and where the parts are adapted to be removed from the patented combination and, from time to time, replaced, replacement of such parts is repair and not reconstruction."

And as regards indicia of an understanding see *El Dorado Foundry, Machine & Supply Co.* v. *Fluid Packed Pump Co.*, *supra; Slocomb & Co., Inc.*, v. *Layman Machine Co.*, *supra*.

[6] See *Leeds & Catlin Co.* v. *Victor Talking Machine Co.*, *supra; Connecticut Telephone & Elec. Co.* v. *Automotive Equipment Co.*, 14 F. 2d 957, affirmed, 19 F. 2d 990.

[7] Is the replaced part the dominant structural element of the combination? *Southwestern Tool Co.* v. *Hughes Tool Co.*, 98 F. 2d 42; *Automotive Parts Co.* v. *Wisconsin Axle Co.*, *supra*, p. 127: "if the new parts so dominate the structural substance of the whole as

It is true that some decisions of this Court in patent misuse cases [8] raised doubt as to the continuing vitality of this standard in actions such as this one for relief from contributory infringement. But the Congress swept away that doubt when it gave the standard statutory sanction in 1952.[9] My Brother WHITTAKER's test that

to justify the conclusion that it has been made anew, there is a rebuilding or reconstruction; and conversely, where the original parts, after replacement, are so large a part of the whole structural substance as to preponderate over the new, there has not been a reconstruction but only repair."

Has there been physical destruction of the combination from use of the component? *Cotton-Tie Co.* v. *Simmons,* 106 U. S. 89.

[8] See, *e. g., Mercoid Corp.* v. *Mid-Continent Investment Co.,* 320 U. S. 661, 669: "The result of this decision, together with those which have preceded it, is to limit substantially the doctrine of contributory infringement. What residuum may be left we need not stop to consider."

[9] 35 U. S. C. § 271. The purpose of (c) of this section appears in the House Judiciary Committee Report, H. R. Rep. No. 1923 on H. R. 7794, 82d Cong., 2d Sess., p. 9. "The doctrine of contributory infringement has been part of our law for about 80 years. It has been applied to enjoin those who sought to cause infringement by supplying someone else with the means and directions for infringing a patent. One who makes a special device constituting the heart of a patented machine and supplies it to others with directions (specific or implied) to complete the machine is obviously appropriating the benefit of the patented invention. It is for this reason that the doctrine of contributory infringement, which prevents appropriating another man's patented invention, has been characterized as 'an expression both of law and morals.' Considerable doubt and confusion as to the scope of contributory infringement has resulted from a number of decisions of the courts in recent years. The purpose of this section is to codify in statutory form principles of contributory infringement and at the same time eliminate this doubt and confusion." The legislative history makes it clear that paragraph (d) complements (c) with the view to avoid the application of the patent misuse doctrine to conduct such as that of the patent owner in the present case. See Hearings, H. R. 3760, 82d Cong., 1st Sess., Subcommittee of the House Judiciary Committee, 1951, pp. 161–162, 169–175.

"[m]ere replacement of individual unpatented parts, one at a time, whether of the same part repeatedly or different parts successively, is no more than the lawful right of the owner to repair his property" plainly would not heed the congressional mandate. Instead Congress meant, as I read the legislative history of the 1952 Act, that the courts should recognize, in actions for contributory infringement, the distinction between components stated in *Wilson* v. *Simpson, supra,* the leading case in this field:

"The other constituent parts of this invention, though liable to be worn out, are not made with reference to any use of them which will require them to be replaced. These, without having a definite duration, are contemplated by the inventor to last so long as the materials of which they are formed can hold together in use in such a combination. No replacement of them at intermediate intervals is meant or is necessary. They may be repaired as the use may require. With such intentions, they are put into the structure. So it is understood by a purchaser, and beyond the duration of them a purchaser of the machine has not a longer use." 9 How. 125–126.

Giles S. Rich, the chief draftsman of § 271 (c), when told that manufacturers of replacement parts for automobiles, tractors, and other machines had protested against the section in fear of being held contributory infringers under it, replied: "Whether or not they would be liable would depend on the facts in each particular case. And I think that the best way to clear that up is to take up section (c) and deal with the matter specifically and point out to you the limitations that are there, which have to be met before anybody is held liable, and then leave it to you to decide whether a parts supplier should be held liable or not, *depending on the kind of a*

*part he may be supplying.* If *the part* he is supplying is *in substance· the very thing which was invented,* it seems to me personally, that he is an infringer, and he should not be let off on some little technicality that there is something minor in the whole apparatus that he is not supplying." Hearings, H. R. 3760, 82d Cong., 1st Sess., *supra,* p. 153. He added: "in each case you would have to look at the details and see what was invented, and in effect whether the alleged infringer is appropriating somebody else's invention, or whether he is not." Hearings, *supra,* p. 157.

However, I disagree with my Brother HARLAN that we should refrain from making an independent application of the proper standard in this case because of the conclusion of both lower courts that the replacement of the top constituted "reconstruction." I would suppose that "repair" or "reconstruction" is so far a question of law as to relieve appellate review from the restraints of Federal Rule of Civil Procedure 52 (a). See *United States* v. *E. I. du Pont de Nemours & Co.,* 353 U. S. 586, 598. In no previous case presenting the question of "repair" or "reconstruction" has this Court believed itself restrained from making an independent determination. *Wilson* v. *Simpson, supra; Cotton-Tie Co.* v. *Simmons, supra; Morgan Envelope Co.* v. *Albany Perforated Wrapping Paper Co.,* 152 U. S. 425; *Leeds & Catlin Co.* v. *Victor Talking Machine Co., supra; Heyer* v. *Duplicator Mfg. Co., supra.* And here the error of the two courts below is manifest. The life of the top was approximately three years in contrast to the several times longer life of the other components of the combination. The top was replaceable at a cost of from $30 to $70 depending on the fabric; in contrast the cost of other elements of the combination was approximately $400. These considerations of themselves suggest that the replacement was mere "repair" of the worn component and not "reconstruction"

of the patented combination. Surely they support the inference that all concerned knew that the fabric of the top would become weather-beaten or unable to perform its protective function long before those other components, not so exposed and more durable as well, wore out. Its perishable nature coupled with its fractional cost as compared to the whole combination and its ready replaceability all point to the conclusion reached here. And particularly persuasive, I think, that this replacement was mere "repair," is the role of the top relative to other components in the inventive concept. Patentable novelty inhered not merely in the shape of the fabric; the record shows that a wiping arm which pressed the material in such way as to create a seal at the belt line of the vehicle played a significantly important role in the inventive concept. The claim for the combination is that it made possible an automatic top, made the top weathertight and prevented unauthorized access to the vehicle. The wiper arm, rather than the shape of the material alone, accomplished the inventive purposes of providing a top which was weathertight and prevented unauthorized access.[10] The shape of the fabric was thus not the essence of the device and in all the circumstances it seems reasonable and sensible to treat the replacement of the top as "repair."

I, therefore, think that the judgment of the Court of Appeals must be reversed, except, however, as to the relief granted respondent in respect of the replacements made on Ford cars before July 21, 1955.

[10] This appears from the patent claims and from the testimony of respondent's patent and engineering experts. The following representation was made in connection with amended claims: "The real invention is fastening the folding material considerably below the top of the tonneau and then using a wiping arm automatically operated by the bow structure for wiping the inside of the folding material as the top is raised and pressing it against the top of the tonneau."

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANK-FURTER and MR. JUSTICE STEWART join, dissenting.

For more than a hundred years it has been the law that the owner of a device covered by a combination patent can, without infringing, keep the device in good working order by replacing, either himself or through any source he wishes, unpatented parts, but that he may not, without rendering himself liable for infringement, reconstruct the device itself, whether because of its deterioration or for any other reason, and even though all of the component parts of the device are themselves unpatented. *Wilson* v. *Simpson,* 9 How. 109; *Cotton-Tie Co.* v. *Simmons,* 106 U. S. 89; *Morgan Envelope Co.* v. *Albany Perforated Wrapping Paper Co.,* 152 U. S. 425; *Leeds & Catlin Co.* v. *Victor Talking Machine Co.,* 213 U. S. 325; *Heyer* v. *Duplicator Mfg. Co.,* 263 U. S. 100. The underlying rationale of the rule is of course that the owner's license to use the device carries with it an implied license to keep it fit for the use for which it was intended, but not to duplicate the invention itself. Correlatively, one who knowingly participates in an impermissible reconstruction of a patented combination is guilty of contributory infringement. "Direct" and "contributory" infringements are now codified in § 271 of the Patent Act of 1952. 35 U. S. C. § 271.[1]

---

[1] "(a) Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent.

"(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

"(c) Whoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, shall be liable as a contributory infringer."

In this case the District Court and the Court of Appeals upon full consideration have concurred in finding that Aro's replacement-supplying of the fabric portion of respondent's convertible automobile tops contributorily infringed the latter's territorial rights under the valid Mackie-Duluk combination patent, in that such activity constituted a deliberate participation on Aro's part in a forbidden reconstruction of the patented combination. In reversing, the Court holds that there can be no direct infringement (and hence, of course, no contributory infringement) of a combination patent by replacement of any of the components of the patented entity unless (1) such component is itself separately patented or (2) the *entire* entity is rebuilt at one time. Since the fabric cover component of the Mackie-Duluk top was not itself separately patented, and since it constituted but one part of the patented combination, the Court concludes that Aro's supplying of such covers for replacement on cars equipped with respondent's tops did not as a matter of law constitute contributory infringement.[2]

---

[2] The Mackie-Duluk invention was described by the Court of Appeals as follows:

"Folding tops for vehicles consisting of bows of wood or metal covered with a flexible waterproof fabric . . . are, of course, as old as the automobile art which in the beginning only adopted with necessary modifications the much older art of collapsible tops for chaises, buggies and some other horse drawn vehicles. The rear panels of the folding tops of earlier days were fastened permanently at the bottom to the outside of the top of the rear portion of the body of the vehicle, and the quarters, the rear portions of the sides of the vehicle, if protected at all, were protected with flaps or curtains, sometimes integral with the top and sometimes not, fastened at the bottom to the outside of the top of the body with buttons, snaps or some equivalent means of fastening. Naturally, to prevent tearing, these quarter flaps had to be unfastened by hand when the top was lowered and when the top was put up fastened again by hand for neat appearance and also to prevent the entrance of rain. This manual fastening and unfastening of the bottoms of the quarter

My Brother BRENNAN's opinion, while disagreeing with
that conclusion, would reverse because on its view of the
record, untrammeled by the contrary findings and conclu-
sions of the two lower courts, it is concluded that what

flaps presented no great problem until the advent of the so-called
convertible automobile with a folding top operated mechanically
rather than manually. The problem presented by the quarter flaps
of tops of this kind was first partially solved by fastening the bottom
of the flap to the outside of the top of the body of the vehicle with
'releasable fastening means,' that is to say, with some sort of slide
fastening device which would detach automatically when the top was
lowered. The major part of the problem remained, however, for
when the top was put up the flaps had to be fastened manually, which
meant that the operator was required to get out of the car altogether,
or at least to reach out, often, of course, in the rain. The object
of the Mackie-Duluk patent was 'to provide an automatic fastening
and sealing means at the top and sides of the tonneau of the con-
vertible' which 'never has to be operated or touched by the driver
of the car.' And, as we have already indicated, the District Court
found that the patentees succeeded in attaining their object by
devising a patentable combination of elements.

"The Mackie-Duluk device consisted of providing an elongated flap
integral with the quarter sections of the fabric top adapted to be
permanently fastened at the bottom deep within the body of the car,
at or perhaps below, but certainly not in front, of the axis of rota-
tion of the bows, to a trough welded to the body of the car and
provided with a drain to carry off water entering between the flap and
the car body. In addition, to minimize the entrance of water between
the body and the flap, they provided a 'wiper arm' so-called, which
in effect acted as an additional, low rearward bow pressing the
downwardly extending flap outwardly against the top of the body of
the vehicle as the top is raised from its folded position to close, or
substantially to close, any gap there might be between the inside of
the top of the body of the car and the flap extending downward into
the interior of the automobile body." 270 F. 2d, at 202–203.

The District Court said:

"Mackie-Duluk was a substantial and enlightened step, filling a long-
felt want, in a field in which defendants have produced, with one
exception, only paper patents, the most emphasized being foreign,
which did not even purport to do what Mackie-Duluk accomplished."
*Id.*, at 201.

here took place constituted "repair" and not "reconstruction" of the Mackie-Duluk tops.

I am unable to subscribe to either of these views.

## I.

I believe that the narrow concept of what constitutes impermissible reconstruction, reflected in the opinion of the Court, departs from established principles—principles which, it will be shown, were approved by Congress when it enacted § 271 of the new Patent Act, over objections of the Department of Justice altogether comparable to the position which it now advances as *amicus* in the present case.

The all-important thing is to determine from the past decisions of this Court what the proper test of "reconstruction" is, for I agree that 35 U. S. C. § 271 (c) limits contributory infringement to that which would be direct infringement, and that § 271 (a), dealing with direct infringement, leaves intact the pre-existing case law. The cases cited above amply demonstrate that there is no single yardstick for determining whether particular substitutions of new for original unpatented parts of a patented combination amount to permissible repair or forbidden reconstruction. The matter is to be resolved "on principles of common sense applied to the specific facts" of a given case, *Heyer, supra,* at 102. The single simple rule of "reconstruction" which the Court finds in those cases can, in my view, only be divined at the expense of reconstructing the decisions themselves.

The leading case is *Wilson* v. *Simpson, supra.* There, in holding that the owner of a planing machine covered by a combination patent could replace from any source he desired the unpatented cutting knives thereof, the Court said, p. 125:

> "The right of the assignee [the owner of the machine] to replace the cutter-knives is not because

they are of perishable materials, but because the inventor of the machine has so arranged them as a part of its combination, that the machine could not be continued in use without a succession of knives at short intervals. Unless they were replaced, the invention would have been but of little use to the inventor or to others. The other constituent parts of this invention, though liable to be worn out, are not made with reference to any use of them which will require them to be replaced. These, without having a definite duration, are contemplated by the inventor to last so long as the materials of which they are formed can hold together in use in such a combination. No replacement of them at intermediate intervals is meant or is necessary. They may be repaired as the use may require. With such intentions, they are put into the structure. So it is understood by a purchaser, and beyond the duration of them a purchaser of the machine has not a longer use. But if another constituent part of the combination is meant to be only temporary in the use of the whole, and to be frequently replaced, because it will not last as long as the other parts of the combination, its inventor cannot complain, if he sells the use of his machine, that the purchaser uses it in the way the inventor meant it to be used, and in the only way in which the machine can be used."

In the *Cotton-Tie* case, *supra,* the question was whether combination patents for the making of ties for cotton bales, consisting of a metal buckle and band, were infringed by one who bought as scrap metal such ties and bands after severance from cotton bales, and resold them for further use as baling ties after piecing together several segments of the old bands and reconnecting the resulting single band with the original buckle. In holding that

this was an impermissible reconstruction of the patented combination,[3] the Court said:

> "Whatever right the defendants could acquire to the use of the old buckle, they acquired no right to combine it with a substantially new band, to make a cotton-bale tie. They so combined it when they combined it with a band made of the pieces of the old band in the way described. What the defendants did in piecing together the pieces of the old band was not a repair of the band or the tie, in any proper sense. The band was voluntarily severed by the consumer at the cotton-mill because the tie had performed its function of confining the bale of cotton in its transit from the plantation or the press to the mill. Its capacity for use as a tie was voluntarily destroyed. As it left the bale it could not be used again as a tie. As a tie the defendants reconstructed it, although they used the old buckle without repairing that. The case is not like putting new cutters into a planing-machine in place of those worn out by use, as in *Wilson* v. *Simpson,* 9 How. 109. The principle of that case was, that temporary parts wearing out in a machine might be replaced to preserve the machine, in accordance with the intention of the vendor, without amounting to a reconstruction of the machine." At 93–94.

. In *Morgan Envelope, supra,* the Court found no contributory infringement on the part of one supplying toilet paper rolls specially designed for use in a patented combination, comprising a dispenser and the paper rolls themselves. Remarking (p. 433) that there "are doubtless many cases to the effect that the manufacture and sale

---

[3] While, as the Court remarks (*ante,* p. 343, n. 9), the Court there did refer to the fact that the original ties were stamped "Licensed to use once only," it is manifest that nothing really turned on that point.

of a single element of a combination, with intent that it shall be united to the other elements, and so complete the combination, is an infringement," the Court found the situation before it distinguishable in that "the element [paper roll] made by the alleged infringer is an article of manufacture perishable in its nature, which it is the object of the mechanism [the dispenser] to deliver, and which must be renewed periodically, whenever the device is put to use." *Ibid.* On similar grounds the Court in *Heyer, supra,* found no contributory infringement in the intentional supplying of unpatented gelatine bands for use in a duplicating machine covered by a combination patent, of which one element was the gelatine band.

On the other hand, in *Leeds & Catlin, supra,* the intentional supplying of phonograph records for use on respondent's talking machines, which were protected by a combination patent covering both machine and records, was held to be contributory infringement, it being found that records were the "operative ultimate tool of the invention," that respondent's records were not inherently "perishable" in nature, and that the supplying of the competitor's records was not to replace records "deteriorated by use" or which had suffered "breakage." (P. 336.)

These cases destroy the significance of two factors on which the Court heavily relies for its conclusion in the present case: first, that the fabric top was an unpatented element of the Mackie-Duluk invention, and, second, that Aro's tops constituted a replacement of but one part of the patented combination. For as was said in *Leeds & Catlin* (p. 333), "[i]t can make no difference as to the infringement or non-infringement of a combination that one of its elements or all of its elements are unpatented"; and in all of these cases the claimed infringing replacement involved only *one* of the elements of the patented combination. Further, the different results reached in the cases, two finding "reconstruction" and

three only "repair," also vitiate the reasoning of the Court, in that they show that the issue of reconstruction *vel non* turns not upon any single factor, but depends instead upon a variety of circumstances, differing from case to case. The true rule was well put by this same Court of Appeals in its earlier decision in *Goodyear Shoe Machinery Co.* v. *Jackson,* 112 F. 146, 150:

> "It is impracticable, as well as unwise, to attempt to lay down any rule on this subject, owing to the number and infinite variety of patented inventions. Each case, as it arises, must be decided in the light of all the facts and circumstances presented, and with an intelligent comprehension of the scope, nature, and purpose of the patented invention, and the fair and reasonable intention of the parties. Having clearly in mind the specification and claims of the patent, together with the condition of decay or destruction of the patented device or machine, the question whether its restoration to a sound state was legitimate repair, or a substantial reconstruction or reproduction of the patented invention, should be determined less by definitions or technical rules than by the exercise of sound common sense and an intelligent judgment."

More particularly, none of the past cases in this Court or in the lower federal courts remotely suggests that "reconstruction" can be found only in a situation where the patented combination has been rebuilt *de novo* from the ground up.[4]

The reference which the Court makes to the *Mercoid* cases, 320 U. S. 661, 320 U. S. 680, is, in my opinion, entirely inapposite, since those cases, as the Court recognizes, p. 344, n. 10, *supra,* dealt with the issue of patent misuse, an issue which specifically is not before the Court

---

[4] Compare note 7, *infra.*

at this time.[5]   I realize that some of the language in the first *Mercoid* case (320 U. S., at 667–669), and more particularly its disapproving remarks about *Leeds & Catlin* (*id.*, 668), may be said to cast doubt on what it appears to me the contributory infringement cases plainly establish.   Yet I cannot believe that *Mercoid* is properly to be read as throwing into discard all the teaching of the repair-reconstruction cases.   What was said in *Mercoid* about contributory infringement must be read in the context of Mercoid's claim, found to have been established, that Mid-Continent had misused its combination patent by attempting in effect to wield it as a weapon to *monopolize* the sale of an unpatented element, a claim which is not here made.

I think it significant that in stating (p. 668) that the doctrine of the *Leeds & Catlin* case "must no longer prevail against the defense that a combination patent is being used to protect an unpatented part from competition," the Court went on to say, at 668–669:

> "That result obtains here though we assume for the purposes of this case that Mercoid was a contributory infringer and that respondents could have enjoined the infringement *had they not misused the patent for the purpose of monopolizing unpatented material.*   Inasmuch as their misuse of the patent would have precluded them from enjoining a direct infringement [citing the *Morton Salt* case] they cannot stand in any better position with respect to a contributory infringer.   Where there is a collision between the principle of the *Carbice* case and the conventional rules governing either direct or contributory infringement, the former prevails." (Italics supplied.)

---

[5] The District Court found against Aro's claim of patent misuse based on respondent's acquisition of territorial rights in the Mackie-Duluk patent.   Aro did not appeal that finding.

Thus *Mercoid,* far from modifying the doctrine of the *Wilson* line of cases as to what constitutes contributory infringement, assumed that doctrine and defined the special circumstances when the court would refuse to give a patentee the benefit of that doctrine.[6] Those circumstances are not present in this case.

As for my Brother BLACK's opinion, the congressional action of 1952, reaffirming what I consider must be taken as the doctrine of the *Wilson* line of cases, also requires rejection of what he now conceives to be a more enlightened policy in this field of law.[7]

---

[6] It seems clear from the legislative history of the 1952 Act that Congress intended (1) to reaffirm the doctrine of contributory infringement as laid down in *Wilson* v. *Simpson* and reasserted in cases like *Leeds & Catlin,* (2) to give that doctrine precedence against a claim of patent misuse as conceived in the *Mercoid* cases, at least where the misuse is said to inhere simply in assertion of patent rights. Both the proponents of the statute and the Department of Justice which opposed it assumed that contributory infringement, as defined in the *Wilson* line of cases, was one thing, and misuse, as then most recently defined in *Mercoid,* another. See Hearings before Subcommittee of House Judiciary Committee on H. R. 3866, 81st Cong., 1st Sess. 53–59 (1949); Hearings before Subcommittee of House Judiciary Committee on H. R. 3760, 82d Cong., 1st Sess. 168–175 (1951). The opinion of the Court seems to reconfirm *Mercoid* to fuller effectiveness than it had even before the 1952 Act by treating it as if the test of whether there was contributory infringement at all was to be found in its language.

[7] This policy was before the Committee in the form of an objection to the proposed codification of the *Wilson* line of cases and its doctrine in the 1952 Act. Despite the objection Congress passed § 271 without amendment.

"Mr. CRUMPACKER: We have received protests from manufacturers of replacement parts for such things as automobiles, farm tractors, and the like, who evidently feel that the language used in this H. R. 3760 would make them contributory infringers of patents on the original article, the tractor or something of that sort.

.　　　.　　　.　　　.　　　.

"Mr. RICH [who was the principal spokesman for the group which drafted the present statute]: Those were the most vociferous objec-

## II.

My Brother BRENNAN's opinion for reversal rests, as I understand it, not upon the view that the two courts below applied wrong legal standards in reaching their conclusion, but that " 'repair' or 'reconstruction' is so far a question of law as to relieve appellate review from the restraints of Federal Rule of Civil Procedure 52 (a)" and to allow the "making [of] an independent *application* of the proper standard" to the facts in this case. (Italics supplied.) For reasons larger than this particular litigation I cannot agree that it is either necessary or appropriate for us to substitute our particular judgment on this particular application of correct standards to the facts.

We do not sit in judgment on the decisions of the lower federal courts because we are endowed with some special measure of discernment, but because it is imperative that on matters of general concern, that is on matters of principle, there should be one authoritative and unifying expositor of federal law. I need not join issue on whether Rule 52 (a) serves to constrict appellate review in cases like this, cf. *Graver Tank & Mfg. Co.* v. *Linde Air Products Co.,* 336 U. S. 271, 275, 279, for the rule which I believe should limit us is based on the purposes which this Court can and should fulfill.

In this case there is no question but that the two courts below adverted to all the relevant standards but, having done so, they concluded that on the facts before them there was contributory infringement. I cannot see what else my Brother BRENNAN is doing but reaching a different conclusion of his own. I cannot understand how such a conclusion, even were it accepted by a majority of the

tors to the old bills on the subject. Whether or not they would be liable would depend on the facts in each particular case. . . ." Hearings before Subcommittee of House Judiciary Committee on H. R. 3760, 82d Cong., 1st Sess., at p. 153 (1951).

Court, could provide greater guidance to either courts or litigants than would a mere statement of approbation for the standards espoused by the courts below.

Because the question of "repair" or "reconstruction" must be a mixed question of law and fact, it does not follow that we should review other than gross misapplications (certainly not present here), when the legal ingredient of this mixture is concededly correct. In the analogous area of determining the issue of patentable novelty, Courts of Appeal have consistently deferred to the judgment of the District Court (see the excellent statement of Judge Fahy in *Standard Oil Development Co.* v. *Marzall,* 86 U. S. App. D. C. 210, 181 F. 2d 280, 283–284), and where they have departed from this judgment the reason has generally been because the District Court had failed to reach its conclusions by reference to correct standards. See *Kwikset Locks, Inc.,* v. *Hillgren,* 210 F. 2d 483; cf. *Great Atlantic & Pacific Tea Co.* v. *Supermarket Equipment Corp.,* 340 U. S. 147, 153, 154. Whether this practice be considered as compelled by the dictates of good sense or by Rule 52 (a), surely particular judgments fairly and reasonably reached in two lower courts in light of correct legal standards deserve at least that same deference from us.

I would affirm.