**GENERAL MILLS, INC.**

v.

**STANDARD BRANDS, INC.**

No. Civ–1–76–90.

United States District Court,
E. D. Tennessee, S. D.

April 26, 1977.

Raymond H. Moseley, Humphreys, Hutcheson & Moseley, Chattanooga, Tenn., Edward M. O'Toole, Merriam, Marshall, Shapiro & Klose, Chicago, Ill., for plaintiff.

Albert L. Hodge, Strang, Fletcher, Carriger, Walker, Hodge & Smith, Chattanooga, Tenn., Walter D. Ames, Watson, Cole, Grindle & Watson, Washington, D. C., Aaron B. Karas, New York City, for defendant.

## MEMORANDUM

FRANK W. WILSON, District Judge.

This is an action for patent infringement. Jurisdiction is asserted pursuant to 28 U.S.C. § 1338(a). The plaintiff, General Mills, Inc., is the owner by assignment of U.S. Patents # 3,935,322 and # 3,937,848 and alleges that the defendant, Standard Brands, Inc., is infringing these patents. The defendant has counterclaimed for a declaratory judgment that each of the said patents is invalid. The case is presently before the court upon the defendant's motion for summary judgment with respect to the validity of Patent # 3,935,322. The defendant contends that Patent # 3,935,-322 (hereinafter sometimes referred to as the 322 patent) is invalid under the provisions of 35 U.S.C. § 103 in that no genuine issue of fact exists but that the invention described in the patent is rendered obvious by certain prior art patents.

In support of its motion for summary judgment the defendant has filed as exhibits the subject patent, its file history, and four other patents which it is contended are prior art patents (See Exhibits A–F). In response to the defendant's motion the plaintiff has likewise filed certain exhibits, including Patent Office documents relating both to the correction and the reissue of the 322 patent, two additional prior art patents, and the affidavit of one John Benson (See Exhibits G–N). The defendant's motion for summary judgment is for decision by the court upon the foregoing exhibits, the admissions in the pleadings and the briefs and oral argument of counsel.

Upon the basis of the record hereinabove recited the following facts appear undisputed in this lawsuit. Upon May 17, 1976, General Mills filed this lawsuit charging Standard Brands with infringement of the 322 patent. Thereafter Standard Brands answered the plaintiff's complaint by denying infringement and filing a counterclaim charging that the 322 patent was invalid. These pleadings, together with the exhibits now before the court, reflect that General Mills, Inc. is the assignee of the 322 patent.

Application for the patent was filed April 27, 1973, by Weiss, et al. and the patent was issued upon January 27, 1976. Previous to the time the application for the 322 patent was filed the following patents had been issued:

| Patent | Name | Date Issued | Exhibit |
|--------|------|-------------|---------|
| Patent # 1,945,947 | (McKay) | February 3, 1934 | (*See* Exhibit D) |
| Patent # 2,014,384 | (Kruttschnitt) | September 17, 1935 | (*See* Exhibit C) |
| Patent # 2,286,646 | (Pringle) | June 16, 1942 | (*See* Exhibit B) |
| Patent # 3,589,356 | (Benson) | November 10, 1970 | (*See* Exhibit E) |
| Patent # 3,576,647 | (Leipa) | April 27, 1971 | (*See* Exhibit G) |

Following the filing of this lawsuit certain minor corrections were made by the Patent Office in the 322 patent (*See* Exhibit M). Also following the filing of this lawsuit the plaintiff initiated an action in the Patent Office seeking to have the 322 patent reissued (*See* Exhibits K, L & N). The reissue of the 322 patent has now been approved by the Patent Examiner subject to the resolution of an issue regarding the applicant's failure to disclose certain patent references in the initial patent application. The principal significance of these reissue documents to the motion now before the court is two-fold: (1) they reveal that the plaintiff acknowledges that Claim # 1 in the 322 patent is "inoperable" and is accordingly to be rewritten in event the patent is reissued; and (2) they reveal that the McKay, Kruttschnitt and Leipa patents cited above (and herein relied upon by the defendant in support of its motion for summary judgment) were not considered as references by the Patent Examiner in the course of the initial prosecution and issuance of the 322 patent.

Some of the undisputed background with reference to the patent the validity of which is here in issue is set forth as follows in the affidavit of John Benson, a food technician employed as the Technical Projects Adviser with the plaintiff, General Mills, Inc.

"For many years, potato chips have been made by slicing raw potatoes into thin sections and frying them in hot oil until they are crisp. In this process, the raw potato sections may be placed in the oil in batches or the separate slices may be put into and removed from the oil in a continuous process. The movement of the slices through the vat of oil may be partially controlled by causing the oil to circulate across the vat, carrying the floating slices with it, or the movement of the slices from the entrance to the exit of the vat be partially controlled by movement of a skimmer across the surface of the oil to move the slices across the vat. The potato chips produced by this traditional process have a random curved periphery, depending on the size and shape of the raw potato, and a random surface curvature, depending on the size, shape, thickness, and moisture content of the raw potato slice and the time spent in the oil as well as the temperature of the oil. These potato chips necessarily are packaged randomly in bulky packages.

"Although the traditional potato chips are a very popular snack food, they do have certain disadvantages. If loosely controlled in the fryer, some chips may stay in the hot oil too long and become dark or burned and others may stick together and become under-cooked. Because the slices are not restrained from curling while in the fryer, they have a random surface curvature. The slices also vary in size depending on the size of the potato. This randomness in shape requires that the potato chips be packaged randomly in bulk, with the result that there are relatively large air spaces among the chips in the package. This, in turn, results in more oxygen being available to oxidize the residual frying oils in the potato chips leading to rancidity of the chips. I understand the average shelf life of such chips is in the order of 4–6 weeks. The bulky packages are also relatively difficult to handle and ship, and they take up more shelf space."

Although not included within the exhibits filed by the parties, certain matters relevant to the history of the fabricated potato chip industry and the participation of the parties to this lawsuit in that industry are set forth in the briefs and arguments of the parties. The following account of the current state of the industry appears to be undisputed and, along with the matters set forth above from the Benson affidavit, may contribute to an understanding of the issues presented in this patent controversy. It appears that the Proctor and Gamble Company has for a number of years marketed on a nationwide basis a stackable fabricated potato chip of uniform size and shape under the trademark "Pringles". More recently both the plaintiff, General Mills, Inc., and the defendant, Standard Brands, Inc., have entered the market, the plaintiff's fabricated potato chip being marketed under the name of "Mrs. Bumby's" and the defendant's being marketed under the name of "Planters". The potato chip industry is a sizable industry, market studies indicating that in excess of one billion dollars worth of potato chips are sold each year within the United States. It appears that the fabricated potato chip industry may now have captured approximately one-tenth of that market.

The foregoing matters are undisputed in the record now before the court. It is upon this record that the defendant's motion for summary judgment must be tested.

The defendant contends that U. S. Patent No. 3,935,322 is invalid under 35 U.S.C. § 103 in that the invention described in the patent is rendered obvious by the prior art. The standard for determining obviousness as set out in 35 U.S.C. § 103 is:

"A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

The Supreme Court in construing § 103 stated in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) that:

"While the ultimate question of patent validity is one of law, . . . the § 103 condition . . . lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." 383 U.S. at p. 17, 86 S.Ct. at p. 694, 15 L.Ed.2d at p. 556.

The defendant in support of the motion for summary judgment contends that the 322 patent is a method patent that is "simplicity itself," that every element of the method described in the patent is fully disclosed by the Pringle, McKay, Kruttschnitt, Benson and Leipa Patents hereinabove referred to, that expert testimony is not required to determine the differences between it and the prior art but rather that the method described in the patent would be obvious to anyone who had read the prior art without the necessity of the reader being skilled in the art of preparing chip-type snack products. The defendant thus asserts that there is no genuine issue as to any material fact and that the issue of the validity of the patent is an appropriate one to be decided upon a motion for summary judgment.

The plaintiff, on the other hand, contends that the patented invention is not rendered obvious by the prior art, but to the contrary represents a substantial improvement over previous methods of producing stackable chip-type snacks and one that could not have been divined from the prior art, the differences between the invention claimed and the prior art as well as the level of ordinary skill in the art all being factual questions which are in dispute and that therefore summary judgment is inappropriate.

### The 322 Patent

The 322 patent is a method patent entitled "Chip Separating from a Fried Ribbon." The patent covers a method for pre-

paring fabricated chip-type snack food products and in particular fabricated potato chips. It should be emphasized that although certain equipment is displayed in the patent drawings, the patent is a method patent and not an apparatus patent. The patent reveals that the chips produced by the method described in the patent are uniform in size and shape and are therefore stackable, a feature which enables them to be packaged in compact containers and which results in certain merchandising advantages, including product uniformity and prolonged shelf life.

The following relevant matters are set forth in the specifications or background statement of the subject patent.

". . . The present invention will be described primarily with regard to preparation of potato chips; however, it should be recognized that various other types of fabricated chips (such as corn chips or wheat chips) may be prepared using the present invention.

"It has been known in the past to prepare chip-type snacks by preparing a dough sheet and cutting sections from the dough sheet. The sections are then fried to form chips. A major difficulty has been confronted in controlling the movement of the sections through the deep fat fryer. . . . The present invention overcomes such problems by frying a continuous ribbon of chips which is moved positively through the system.

"The present invention includes method and apparatus for preparation of a dough material, sheeting and cutting the dough material into a ribbon of chips, frying the ribbon of chips and then severing the fried ribbon into individual chips.

"The dough may be prepared from any of various particulate starchy food materials such as potato granules, potato flakes, wheat flour, rice flour, corn grits and the like. . . .

\* \* \* \* \* \*

"The dough is sheeted to any suitable thickness. . . . The pieces remain connected by a narrow portion which is large enough to permit processing of the ribbon of connected dough pieces through the fryer without separation or breakage of the ribbon. The connecting portion may be small enough to permit easy separation of the chips after removal from the fryer. . . .

"The ribbon is transported through a bath of hot oil to fry the ribbon using any desired type of fryer. . . .

"The ribbon is removed from the frying oil and separated into individual chips. . . . ."

█ It is of course well settled that the claims of the patent are the sole measure of the monopoly granted by that patent. *ARO Manufacturing Co., Inc. v. Convertible Top Replacement Co., Inc.*, 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592 (1961). In the 322 patent there are a total of ten claims. All of the claims other than 1, 2 and 9, however, are dependent claims, Claims 3 through 8 being expressly made dependent upon Claim 2 and Claim 10 being expressly made dependent upon Claim 9. Of the dependent claims, all except Claim 3 merely state dimensional or other inconsequential matters that are wholly insignificant to the validity of the patent. Accordingly, in testing the validity of the patent it is necessary to consider only the matters set forth in Claims 1, 2, 3 and 9, these claims being as follows:

1. A method for preparing fabricated potato chips comprising mixing at least one member of the group consisting of potato flakes and potato granules with water to form a dough, said water being present in an amount of from 25 to 45 percent based on the total weight of the dough, sheeting said dough, cutting said sheeted dough to produce a continuing ribbon, transporting said ribbon through a hot oil bath thereby frying said ribbon, said ribbon extending from the entrance to the exit of said bath and then separating said ribbon into individual potato chips.

2. A method of preparing chip-type snacks comprising: mixing a farinaceous material and water to form a farinaceous dough, said water being present in an

amount sufficient to provide a dough having sufficient cohesiveness to stick together as a sheet and less than that amount of water that would result in the dough sticking to equipment, the moisture content of said dough being about 25 to 45 percent by weight; forming the dough into a ribbon having alternating wide portions and narrow portions; frying the ribbon of dough in an oil bath, said oil bath having an entrance and an exit, said ribbon extending continuously from said entrance to said exit, thereby frying said ribbon; removing the ribbon from said oil bath and then separating the ribbon at the narrow portions to provide individual chips.

3. The method of Claim 2 wherein said ribbon is shaped between a pair of surfaces during frying.

\* \* \* \* \* \*

9. A method of preparing chip-type snacks comprising;

mixing a farinaceous material and water to produce a dough, said farinaceous material being a member selected from the group consisting of potato material, wheat flour, rice flour, and corn grits, said water being present in an amount of between 25 and 45 percent, basis total weight of dough;

sheeting the dough to a thickness of about 0.015 to 0.06 inches;

cutting the dough sheet into a ribbon including alternating wide portions of 1 to 2 inches and narrow portions of 1/8 to 3/8 inches;

frying the ribbon by passing said ribbon through a bath of hot oil, said ribbon extending continuously from the entrance to the exit of said bath;

removing the fried ribbon from said bath; and

separating said ribbon at said narrow portions, said wide portions thereby producing individual fabricated chips.

\* \* \* \* \* \*

Thus, the claims of the 322 patent teach the following methods for preparing fabricated potato chips or other chip-type snacks: (1) the mixing of potato flakes, potato granules or farinaceous material with 25 to 45 per cent water to form a dough; (2) sheeting or cutting the dough to form a continuous ribbon having a pattern of alternating wide and narrow portions; (3) shaping and frying the continuous ribbon of dough by transporting it between a pair of surfaces through a hot oil bath; and (4) removing the ribbon from the hot oil bath and separating the ribbon into individual chips at the narrow portion of the ribbon.

As stated in 60 Am.Jur.2d § 56 at p. 366, the rules for determining obviousness in light of the prior art are:

"The prior art . . . supplies the evidence of obviousness under 35 U.S.C. § 103. An applicant is bound by such prior art whether or not he had actual knowledge of it at the time he made his invention. A would-be patentee is presumed by law to have had all prior patents before him when he applied for his patent. One way to apply the obviousness test of 35 U.S.C. § 103 is to picture the inventor working in his shop with the prior art references—which he is presumed to know—hanging on the walls around him.

"The issue of obviousness is not determined by what the references expressly state, but by what they would reasonably suggest to one of ordinary skill in the art. A rejection for obviousness does not require that each precise element of the claim be found in the prior art."

With these principles in mind, the prior art relied upon by the defendant will now be considered.

### The McKay Patent (1,945,947)

The McKay Patent was issued in 1934. The specifications describe a method of making a ready-to-eat cereal food by forming a ribbon of whole or broken kernel cereal into a "strip, ribbon, or shred" (page 1, line 32) cooking the strip or ribbon by placing it "in a hot bath of frying medium" (page 2, line 14), the strip or ribbon to be

"thereafter severed or broken into pieces or fragments of the desired lengths or dimensions" (page 1, line 48). Claim 1 of the McKay Patent reads in pertinent part as follows:

"A process of making a ready-to-eat cereal food comprising cooking in moisture cereal grains, *forming the same into a strip, shred, ribbon and the like,* . . . drying the strip etc., and subjecting pieces or fragments of strip etc. to heat. . . ." (Emphasis added)

Thus McKay reveals a method of forming a cereal based food material into a ribbon which is cooked in a hot oil bath and then severed into fragments of desired length.

### The Kruttschnitt Patent (2,014,384)

The Kruttschnitt Patent was issued in 1935. It covers a dough cooking machine. On page 1 at line 1 it states:

"The present invention relates to a dough making machine of the type in which a continuous strip or rope of dough is passed through a fluid cooking medium such as hot fat, and subsequently cut into lengths suitable for sale."

Then at line 9 Kruttschnitt states:

"The principal object of the invention is to provide continuously moving means for keeping the dough submerged in the cooking medium if the latter be a liquid, to insure even cooking and for enclosing the dough to preserve its shape during its travel through the cooking medium. Other objectives of the invention are to provide means for properly regulating the fed dough; . . . and for automatically cutting the discharging strip of cooked dough into lengths which may be varied at will."

Claim 1 of the Kruttschnitt Patent reads:

"A dough cooking machine comprising means for feeding a continuous strip of dough and a continuously traveling mold for enclosing and advancing said strip of dough through a cooking medium. . ."

Kruttschnitt thus clearly shows the idea of forming a continuous ribbon or strip of dough, encasing the ribbon in a continuous mold during a controlled submersion in a cooking medium and the separation of the ribbon into desired lengths after cooking.

The McKay and Kruttschnitt Patents taken together thus reveal a method of forming a continuous ribbon of dough which is then transported while encased in a continuous mold through a hot oil bath, the ribbon being removed from the bath after cooking and being separated into units of the desired length, resulting in a chip-type snack food.

### The Pringle Patent (2,286,646)

The Pringle Patent was issued in 1942. It covers a method of making potato chips so that the chips will be substantially uniform in size and shape. The Pringle Patent states on page 1 at line 35 that:

"It is also an object of the invention to provide potato chips in wafer form, the individual wafers being uniform in size, shape, color, and in all other characteristics."

Continuing at line 47 Pringle states:

"Still another important object of the invention is to provide a food product in wafer form of such uniformity in size, weight and shape that it can be economically packaged in a very compact manner so as to exclude any appreciable quantity of air, moisture or other agencies tending to affect the crispness, wholesomeness, freshness, or other qualities possessed by the newly manufactured product."

In order to accomplish these objectives Pringle claimed a method of slicing raw potatoes into uniformly shaped thin sections and then restraining these sections as they were passed through a cooking medium in order that the uniform size and shape would be retained. Pringle's method did not involve the use of a dough or a continuous ribbon but is important in that it teaches a method of making a uniformly shaped potato chip which could be compactly packaged.

### The Benson Patent (3,539,356)

The Benson Patent was issued in 1970. It is a method or process patent "particular-

ly adapted to the production of a potato chip-like product made from either a finely divided potato product alone or a combination of such potato product with other cereals or starch materials" (column 1, line 24). Claims 1 and 4 of the Benson Patent teach a method of making dough of "potatoes or other farinaceous materials" (column 7, line 32), the dough "containing 22–32% moisture" (column 7, line 13), forming the dough into a desired shape and size and deep-fat frying the pieces in oil.

### The Leipa Patent (3,576,647)

The Leipa Patent was issued in 1971. It teaches a method of preparation of precooked chip-type food products, including fabricated potato chips. In pertinent part it claims:

"A method of preparing crisp, chip-type snack food products having a predetermined, uniform shape, and made from an edible dough, said method comprising

(a) rolling a quantity of dough . . . [between] sheeting rolls to form a thin, flat dough sheet,

(b) cutting dough sections of predetermined, uniform shape from said dough . . .

(c) . . . depositing the sections upon one of a pair of curved, similarly configured, cooperating, apertured mold surfaces,

\* \* \* \* \* \*

(f) enclosing said cooperating mold surfaces about said cut dough sections and spacing said mold surfaces uniformly . . . throughout their areas to restrain and shape said cut dough sections in conforming relationship thereto,

(g) passing said restrained sections through a reservoir of hot frying fat until they are crisp to form a plurality of uniformly shaped, chip-type food products,

(h) removing said restrained sections from said reservoir, and

(i) releasing said chips from said molds."

The Leipa method, like that of the 322 patent, starts with a dough made from some farinaceous material and water [the plaintiff does not contend that there is anything novel about the amount of water added to make the dough] which dough is then sheeted. Then the two methods differ. Under Leipa the dough is cut into individual sections while under the 322 patent the dough is formed into a ribbon having alternating wide and narrow portions. Then the two methods become similar again. In Leipa the individual sections of dough are encased in individual molds and transported in a controlled manner through a hot oil bath, thereby frying the sections in a uniform shape. Under the 322 patent the continuous ribbon is encased in a continuous mold and in a controlled manner transported through a hot oil bath, thereby frying the ribbon in a uniform shape. Then both the sections and the ribbon are removed from the hot oil bath, the sections while still encased in individual molds and the ribbon upon leaving the continuous mold. The sections in Leipa are then removed from the molds yielding individual chips while the ribbon in the 322 patent is separated at the narrow portions to make individual chips.

The Leipa method and the 322 method are quite similar except for the ribbon feature of the 322 patent. The fact that a continuous mold, rather than individual molds, is used is a natural consequence of frying a ribbon rather than individual sections of dough. However, the idea is the same: to use a mold to give the sections or ribbon a uniform shape when fried. It is clear that everything in the 322 method is shown by Leipa except the frying of a ribbon having alternating wide and narrow portions and the separation at the narrow portions to form individual chips following the cooking process.

It has been previously noted that the McKay and Kruttschnitt Patents taken together reveal a method of forming a continuous ribbon of dough which is then transported while encased in a continuous mold through a hot bath, the ribbon being removed from the bath after cooking and being separated into units of the desired length. Pringle reveals the formation of uniformly shaped potato slices and the re-

straining of these while passing through a hot oil cooking medium to produce potato chips of uniform size and shape. Benson and Leipa reveal the making of fabricated potato chips from an initial ribbon of dough. Leipa also reveals the cutting, molding and cooking of the potato dough to form potato chips of uniform shape and size.

From the foregoing review of the 322 patent and of the prior art herein cited, it is apparent that the sole matter in the 322 patent not specifically disclosed in the prior art is the imparting of a wide and narrow pattern to the dough and the breaking of the chips at the narrow section following the cooking process. The making and cooking of dough in a continuous ribbon and the separating of the cooked dough product into units of the desired size are disclosed in the McKay and Kruttschnitt Patents. The imparting of a pattern to the dough prior to cooking is described by the Benson and Leipa Patents. The molding, cooking and removal of chips of uniform size and shape is disclosed by the Leipa Patent. The court is of the opinion that the differences, if any, between the 322 patent and the prior art is so inconsequential as to be obvious to a person of normal intelligence and observation, much less one skilled in the art of making fabricated potato chips or other chip-type snack food. It would appear to the court that the method is so readily understandable that a factual determination as to the level of skill in the art is unnecessary. *See Research Corp. v. Nasco Industries, Inc.*, 501 F.2d 358, 361 (7th Cir. 1974); *Monaplastics, Inc. v. Caldor, Inc.*, 378 F.2d 20, 21 (2nd Cir. 1967); *Walker v. General Motors Corp.*, 362 F.2d 56 (9th Cir. 1966); *Ronel Corp. v. Anchor Lock of Florida, Inc.*, 325 F.2d 889, 890 (5th Cir. 1963).

In reaching this decision the court has taken into account the affidavit of John O. Benson, a person representing himself as being skilled in the art. In his affidavit Mr. Benson avers that the claimed method is not rendered obvious by prior art. It should be noted, however, that the Benson affidavit discusses only the McKay and the Kruttschnitt Patents. It makes no reference to the Pringle, Benson or Leipa Patents.

In a further effort to establish the unobviousness of the 322 patent, the plaintiff seeks to assert that the pattern imparted to the dough, and more specifically the narrowed portion of the pattern, serves to function as a hinge which permits the ribbon to be bent upon removal from the oil bath without destroying the saddle shape imparted to the ribbon in the molding and cooking process. To the extent that the plaintiff seeks to rely upon this feature as distinguishing the 322 patent from the prior art, it is sufficient to note that this function is nowhere either disclosed or claimed in the 322 patent. Assuming however that the plaintiff is entitled to the benefits of the hinging function even though not claimed and further assuming that this advantage amounts to that "impalpable something" or "synergistic result" necessary for a combination of old elements to be rendered unobvious, it is still not sufficient to render the method claimed in this case patentable. It must be remembered that this is a method patent, not an apparatus patent. The hinging effect becomes important only when the method is used with an apparatus that requires the ribbon to be bent after leaving the fryer and when the saddle shape imparted to the ribbon may be destroyed by such bending. It is entirely possible that the claimed method may be used with an apparatus which does not require the bending of the fried ribbon. With such an apparatus the ribbon might leave the fryer at a straight angle. Indeed, the 322 patent states in the specifications, column 4 at line 28, that:

"The fryer may be a fryer substantially like that described and claimed in patent application, Ser. No. 355,259 entitled SNACK FRYER filed on even date herewith, which description is incorporated herein by reference. *Alternatively, the fryer may be of any type through which the ribbon may be passed during frying.*" (Emphasis added)

Likewise, the shape imparted to the ribbon may be one which will not be destroyed by bending. The 322 patent states in column 5 at line 26 that:

"The surfaces 78 and 101 [the mold surfaces] may be shaped the same and for example may be flat or semi-circular."

The plaintiff may have an apparatus for using the claimed method for making U-shaped chips which requires the functional advantage of the hinging effect of the narrow portion of the ribbon. However, that apparatus is not involved in this lawsuit, and the hinging effect, when considered as to the method alone, is not sufficiently novel to warrant patentability of the claimed method.

The court accordingly concludes that there is no genuine issue as to any material fact in this case but that all of the elements claimed in the 322 patent are revealed by the prior art.

As stated in *Ballantyne Instruments & Electronics, Inc. v. Wagner*, 345 F.2d 671, 672 (6th Cir. 1965):

"The public interest in every patent case requires that suits involving the validity of patents should be speedily determined. Thus, wherever patent litigation can be expeditiously handled on motions for summary judgment it should be done provided the necessary safeguards to protect the rights of the litigants are observed. One such safeguard is . . . that there be no real question of fact involved."

More recently in *Tee-Pak, Inc. v. St. Regis Paper Company*, 491 F.2d 1193, 1195 (6th Cir. 1974) it was stated that:

"In appropriate circumstances when the invention is easily understood and there is no need for expert testimony, summary judgment may be a useful tool in cases where the validity of a patent is involved."

The court is of the opinion that this is such a case and that summary judgment is appropriate adjudicating the invalidity of U. S. Patent No. 3,935,322 in light of the prior art patents discussed herein and pursuant to the provisions of 35 U.S.C. § 103.

An order sustaining the defendant's motion for partial summary judgment and declaring U. S. Patent No. 3,935,322 invalid will be entered.