**FMC CORPORATION, Plaintiff,**

v.

**UP–RIGHT, INC., et al., Defendants.**

No. C 92–0321 SC.

United States District Court,
N.D. California.

Feb. 22, 1993.

Raymond P. Niro, Robert A. Vitale, Raymond P. Niro, Jr., Niro, Scavone, Haller & Niro, Palo Alto, CA, Martin L. Fineman, Brobeck, Phleger & Harrison, San Francisco, CA, for plaintiff.

Ernest M. Anderson, Bruce H. Johnsonbaugh, Eckhoff, Hoppe, Slick, Mitchell & Anderson, San Francisco, CA, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CONTI, District Judge.

This case came on for trial without jury before Judge Samuel Conti on February 8, 9, 10, and 11, 1993. Appearing for plaintiff FMC, Inc. were Raymond P. Niro, Robert A. Vitale, and Raymond P. Niro, Jr. of Niro, Scavone, Haller & Niro, and Martin L. Fineman of Brobeck, Phleger, & Harrison. Appearing for defendant Up–Right, Inc. were

Ernest M. Anderson and Bruce H. Johnson-baugh of Eckhoff, Hoppe, Slick, Mitchell & Anderson.

The issue to be decided by the court in this action is the difference between "repair" and "reconstruction" of a patented combination. Plaintiff FMC, Inc. alleges that defendant Up–Right, Inc.'s actions amount to "reconstruction" and thus they are liable for additional royalty payments, whereas defendant claims their activities are merely permissible "repair," and thus that they are not liable for additional royalties. The Court having heard and reviewed all of the evidence and considered the parties' arguments, makes the following Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

1. Plaintiff FMC is a Delaware corporation having a principal place of business in Chicago, Illinois.

2. Defendant Up–Right, Inc. ("Up–Right") is a California corporation having its principal place of business in Selma, California.

3. Defendant American Grape Harvesters, Inc. ("American Grape") has been dismissed as a party defendant pursuant to a confidential settlement agreement with FMC.

4. FMC filed this action on January 14, 1992 seeking, among other things, damages for infringement of U.S. patent 4,286,426 (the " '426" or "Orlando" patent). The sole remaining issue before the court is FMC's claim that Up–Right has engaged in impermissible reconstruction of certain "Rotary Pulsator" grape picking heads in violation of the '426 patent, the prior judgment of this court, and a written settlement agreement executed in the prior litigation between FMC and Up–Right.

5. Prior to June 1, 1990, Up–Right manufactured and sold grape harvesting machinery. Up–Right sold both grape harvesters, which are large vehicles which drive along rows of grapes shaking the grapes from the vines, and picking heads, which are the portion of the harvester that comes in contact with the vines. Up–Right also sold replacement parts for their products.

6. On June 1, 1990, Up–Right sold its harvester division to American Grape. That sale included all inventory and facilities. American Grape continues to manufacture and sell both harvesters and heads.

7. FMC does not sell harvesters. FMC manufactures and sells its patented ('426 patent) picking head as a replacement head for use in Up–Right harvesters.

8. In prior litigation, Up–Right's Rotary Pulsator head was found to infringe the '426 patent, and Up–Right was enjoined from further manufacture of the Rotary Pulsator. Following the liability phase of that litigation, the parties entered into a settlement agreement, under which Up–Right paid FMC $2,515,000.

9. The settlement agreement provided in pertinent part as follows:

2. FMC releases Up–Right and customers of Up–Right from liability for patent infringement with respect to all rotary pulsator picking heads sold by Up–Right prior to September 20, 1988. Up–Right. may not, from September 20, 1988 forward, make, have made, reconstruct, use, or sell any rotary pulsator picking head, excepting only that Up–Right may sell those eighteen (18) rotary pulsator picking heads (fifteen as installed in harvester machines in its rental fleet and three spare units) identified by Up–Right serial numbers on Exhibit A hereto, and further that Up–Right may use said eighteen picking heads in, but only in, its rental fleet until said picking heads are sold. Up–Right additionally agrees that each of said fifteen rotary pulsator picking heads as installed in the respective harvester machines in its rental fleet may only be sold as an integral part of said Up–Right grape harvester machines, and may not be sold separately.

3. No license is granted by FMC to Up–Right under the Orlando patent in suit. . . .

10. At the time of the settlement, Up–Right had sold 192 heads. With one or two exceptions, those 192 heads are still in service.

11. During settlement negotiations, FMC offered Up–Right a license to continue to manufacture and sell Rotary Pulsator heads

at a royalty of $12,000 per head. Up–Right declined the offer.

12. Since the date of the settlement agreement, Up–Right has not manufactured or sold any new Rotary Pulsator heads. Approximately fifteen of the eighteen heads in stock at the time of the settlement have been sold in accord with the terms of the settlement, and are not at issue in this case.

13. By previous order dated January 8, 1992, this court found that under both the settlement agreement and applicable law, the owners of the 192 Rotary Pulsators have the right to use, repair, and resell the heads. They do not, however, have the right to reconstruct those heads.

14. From the time of the settlement until the sale of the harvester division on June 1, 1990, Up–Right continued to manufacture and sell replacement parts for the existing 192 heads. Up–Right continued to service some of the existing heads, while service on others was performed either by independent service companies or by the owners themselves.

15. Subsequent to June 1, 1990, American Grape has continued to manufacture and sell replacement parts for the existing 192 heads, and to service some of the heads.

16. FMC contends that the sale of replacement parts has enabled owners to reconstruct their Rotary Pulsator heads impermissibly, and thus that Up–Right is guilty of contributory infringement. The claim of the '426 patent which FMC alleges has been reconstructed is Claim 1, which reads:

1. In a harvesting apparatus that includes a vehicle movable to a position adjacent to the plant to be harvested, said vehicle including a support frame, a shaker assembly mounted to said vehicle support frame for shaking the trunk of a plant to dislodge crops therefrom comprising: a shaker frame, means connected to said support frame for mounting said shaker frame for pivoting about a single axis that is overhead the plant to be shaken, said shaker frame including first and second frame sections that extend downwardly of said axis

of rotation in substantially fixed relation to each other and that terminate in outer ends, striker members connected to said outer ends in opposing relation, and drive means separate and distinct from said striker members and being connected thereto only through said shaker frame for oscillating said shaker frame as a single unit about said axis to cause said striker members to alternately impact the opposite sides of the trunk of said plant, said drive means being connected to said striker frame at a height situated generally above said plant.

17. In the field, several Rotary Pulsator parts experience frequent breakage and wear. Most prominently, the rails which strike the vine trunks experience cracking, bending, and wear, as do the C–Arms to which those rails are attached. To some extent, these parts can be patched and welded, and owners often add additional steel reinforcements. Often, however, these parts are too damaged to be repaired, and are instead replaced.

18. Similarly, the elements of the drive linkage experience considerable wear. The three geared shafts (two crankshafts and one driveshaft) which transfer force to the rotating weights experience geartooth wear and cracking as a result of repeated cyclical loading, and must be replaced periodically, along with the drive chain.

19. A number of rubber bushings in the support means also experience wear, and are regularly replaced. These are referred to as the rubber mounts (eight per head) and arm bushings (four per head).

20. At trial, the central evidence on which both parties relied consisted of summaries of parts sales of various replacement parts for the Rotary Pulsators, by both Up–Right and American Grape. Those summaries were divided into two categories. The majority of the replaced parts at issue were "Rotary specific" parts, meaning that the parts could only be used in Rotary Pulsators.[1] Sales of these parts are summarized in defense exhibits 529A and B.[2] A second parts summary,

---

1. Typically, these parts are custom-made for the Rotary Pulsator. In some cases, however, they are widely available parts that Up–Right uses only on the Rotary Pulsator, such as a standard

drive chain that is not used in their other products.

2. Exhibit 529A is an earlier summary, through September 1992; much of FMC's calculations

defense exhibits 530A and B, lists "common parts" sold from January 1989 through December 1992. Common parts are parts that can be used in a number of Up–Right products including Rotary Pulsators.

21. At trial, several inaccuracies and omissions in the parts summaries were identified by both parties, as follows:

a. Part number 10229–000–00, Lower Arm Socket, is incorrectly identified as having a list price of $355.18. In fact, the price of this item is about $12.50.

b. The rotary-specific list does not include a listing for the pivot arms. Testimony of Thomas M. Thompson, general manager of Up–Right's harvester division and president of American Grape, established that in fact approximately nine of those parts had been sold, at an approximate price of sixty dollars each.[3]

c. The rotary-specific list contains sales of only 32 drive chains. That part, however, is a standard type of chain, and the parties agree that in most cases users purchased replacement chains from other sources. The lifetime of that chain is conceded to be less than three years. Accordingly, the court finds that the chain has been replaced at least once in all of the existing heads, and adjusts the part summary to reflect sales of 192 chains.

d. Where a part has never been sold, the summary does not reflect a price for that part. The most significant of these parts is the main housing weldment (including its two end covers). Thomas M. Thompson was asked by the court to estimate the cost of that part. Mr. Thompson opined that it would cost roughly $1,500 to produce, and would sell for at least twice that. Plaintiffs dispute this, and no evidence other than Mr. Thompson's opinion was offered. For purposes of computation, the court sets the retail price of this part at $1,500.

e. By far the predominant part on the common parts list is a "curved picking rod." This part is used primarily on heads other than the Rotary Pulsator, but is occasionally fitted to Rotary Pulsators when harvesting particularly difficult fields. Up–Right estimates that less than 200 of these rods are used on Rotary Pulsators per year, and this estimate is not disputed. For purposes of computation, the court sets the number of curved rods sold for use in Rotary Pulsators at 800.

22. Adjusting the parts summaries to account for the above corrections, the corrected totals for both Rotary-specific parts sales and common parts sales are as follows:

| | |
|---|---|
| Drive Chains: | 192 total sales |
| Pivot Arms: | 9 total sales |

Average Annual Sales of Rotary Specific Parts:

| | |
|---|---|
| Exhibit 529A Total: | $151,985.00 |
| Plus 8.5%:[4] | $12,919.00 |
| Plus Add'l Chains: | $7,203.60[5] |
| Plus Pivot Arms: | $135.00[6] |
| Less Lower Arm Socket: | <$5,825.50> |
| Adjusted Annual Ave.: | $167,497.10 |

Average Annual Sales of Common Parts:

| | |
|---|---|
| Exhibit 530A Total: | $105,066.00 |
| Less Curved Rods: | <$72,413.00> |
| Adjusted Annual Ave.: | $32,653.00[7] |

Total Annual Replacement of Parts: $200,150.10[8]

23. Up–Right occasionally provided spare parts that do not appear on the parts summaries. Warranty parts do not appear, nor do parts that were placed in a few heads that were traded in and resold. Estimates at

---

were based on this earlier summary. 529A contains both total sales and 1992 prices, and calculates the annual average total sales amount of both individual parts and all parts. 529B updates the total number of parts sold through December 1992, but does not update the annual average dollar amounts. Rather than repeat the calculations, the court will use 529A for annual dollar averages, and 529B for total sales numbers. The annual averages will be increased by 8.5 percent, to account for additional sales in the last quarter of 1992.

3. Thompson testified that the cost to produce this part was between 30 and 40 dollars, and that retail would be roughly twice that figure.

4. Adjustment to account for sales in last quarter of 1992.

5. 160 chains at $180.09 divided by 4 years.

6. 9 times $60.00 divided by 4 years.

7. This figure assumes that *all* common parts other than the curved rods were installed in Rotary Pulsators rather than other products. As no evidence was presented to the contrary, the court will adopt this assumption, noting that it likely overstates the rate of replacement by $10,000 or more.

8. Retail cost of parts in 1992 dollars.

trial were that these parts increased the totals by some 2 to 5 percent. The court finds that these sales are de minimis, and more than balanced by common parts that were used in other products, and thus will not adjust the totals to reflect them.

24. With the exception of the above-noted adjustments, the court finds defendant's exhibits 529 and 530 to be factual, and adopts the figures therein.[9]

25. The average net sale price of Rotary Pulsators, exclusive of installation costs, was $21,869. Including installation costs of approximately $2,500, and converting to 1992 dollars, the average total price is slightly in excess of $30,000.

26. Up–Right's cost of production of a Rotary Pulsator, including manufacturing overhead and labor, but excluding general overhead (marketing, sales, administrative costs, liability, and research and development) was roughly $8,000 in 1992 dollars.

27. Up–Right's cost of production of spare parts, including manufacturing overhead and labor, but excluding general overhead (marketing, sales, administrative costs, liability, and research and development) was roughly 60% of list price.

28. The original purchase price of a complete harvester is approximately $150,000, including picking head.

29. At trial, evidence centered on a number of specific major parts. Sales of those parts are summarized below. The number of parts in the field is derived by multiplying the number of heads (192) by the number of each part a single head contains; thus, for example, as each head has four C–Arms, the number in field is 768.

| PART | NUMBER IN FIELD | REPLACEMENTS SOLD |
|---|---|---|
| Left Rail | 192 | 255 |
| Right Rail | 192 | 267 |
| C–Arm | 768 | 510 |
| Rubber Mount | 1,536 | 887 |
| Arm Bushing | 768 | 894 |
| Top Weight | 384 | 3 |
| Bottom Weight | 384 | 2 |
| Housing Weldment | 192 | 0 |

9. Where relevant, figures from those summaries are reproduced herein.

10. There was little or no testimony concerning the myriad lesser parts; presumably many are integral parts of the elements of claim 1. For example, the drive means will contain mounting

| PART | NUMBER IN FIELD | REPLACEMENTS SOLD |
|---|---|---|
| Driveshaft Wldmt | 192 | 168 |
| Crankshaft Wldmt | 384 | 62 |
| Chain | 192 | 192 |
| Lower Arm Socket | 768 | 70 |
| Pivot Arm | 768 | 9 |
| Motor | 192 | 18 |

30. At trial, the parties disputed which parts should be counted as part of which elements of Claim 1 of the patent.

31. As regards the striker frame, FMC contends that only the C–Arms should be counted as part of this element. However, the claim reads "said shaker frame *including* first and second frame sections that extend downwardly of said axis of rotation *in substantially fixed relation to each other* and that terminate in outer ends. . . ." (Claim 1, emphasis added). The choice of "including" instead of "comprising," coupled with the requirement that the arms be "in substantially fixed relation to each other," compel a finding that the shaker frame includes the central portion of the structure, known as the main housing weldment. The phrase "that terminate in outer ends . . ." similarly is read to include the lower arm sockets that comprise those outer ends.

32. Similarly, FMC urges a reading of "support means" that includes only the eight rubber mounts and four bushings. The rubber mounts, however, are merely the inserts at the ends of the four pivot arms. Without the arms themselves, the bushings are incapable of supporting the head. Thus any coherent reading of "support means" must include the pivot arms.

33. FMC also urges a reading of "drive means" that would include only the chain and the sprocketed shafts, and perhaps the eccentric weights. The head oscillates as a result of the spinning of those weights. Those weights in turn will not spin without a motor, and thus "drive means" must be read to include at least the motor.

34. Therefore, the court finds that *at a minimum* [10] the following parts comprise the following elements of the claim:

hardware, hydraulic hoses, fittings, chain tensioners, power supply wiring, and control circuitry in addition to the parts listed above. The court notes that plaintiffs did not identify a single listed part as *not* being part of one of the claim elements. As the evidence was limited to the

| Shaker Frame: | Main Housing Weldment (including end plates), 4 C–Arms, 4 Lower Arm Sockets. |
|---|---|
| Striker Members: | Left- and right-hand rails. |
| Drive Means: | Driveshaft weldment, 2 Crankshaft weldments, Chain, 4 Weights, Motor. |
| Support Means: | 4 Pivot Arms, 4 Arm Bushings, 8 Rubber Mounts. |

35. The evidence at trial did not pertain to any specific head. Rather, the evidence was of total parts sales into the population of heads. The court recognizes that, as a result, it cannot find with certainty that any particular head did or did not have any or all parts replaced. The court can and does, however, assume that all rotary-specific parts were installed in the 192 heads, and that some proportion of the common parts found their way into those heads.

## II. CONCLUSIONS OF LAW

### A. *Preliminary Considerations*

#### 1. Joint and Several Liability

■ FMC contends that the alleged reconstructions were performed over time, with parts that before June 1, 1990 were supplied by Up–Right, and after June 1, 1990 were supplied by American Grape. In addition, FMC alleges that a considerable inventory of parts was manufactured by Up–Right, transferred to American Grape, and later sold by American Grape. As a result, FMC contends, liability should be joint and several. Up–Right, on the other hand, argues that its liability, if any, must be limited to parts sold between the October 1988 settlement and the June 1990 sale of its harvester division.

■ Under federal patent law, when infringement results from the participation and combined or successive action of several parties, those parties are joint infringers, and are jointly liable. *See, e.g., Shields v. Halliburton Co.*, 493 F.Supp. 1376, 1389 (1980) ("Infringement of a patented process or method cannot be avoided by having another perform one step of the process or method."). The result is the same where one or more of

the accused infringers is a contributory infringer:

> A contributory infringer, like any joint tortfeasor, is responsible for the full extent of the harm suffered by the plaintiff. Like any tortfeasor, defendants are liable not only for the portion of the harm they caused, but also the portion of the harm caused by the direct infringer.

*Syntex (U.S.A., Inc. v. Paragon Optical, Inc.,* 7 U.S.P.Q.2d 1001 (D.Ariz.1987).

Thus, if any Rotary Pulsators have been reconstructed, both Up–Right and American Grape will be jointly liable for that infringement if parts used in those reconstructions were sold by both of them.[11]

#### 2. Res Judicata

■ Up–Right also argues that FMC was aware at the time of the original suit that Up–Right was selling replacement parts for its Rotary Pulsators. Up–Right maintains that, having failed to argue at that time that these sales constituted impermissible reconstruction, FMC should be barred from so arguing now.

■ This argument is wholly without merit. Res Judicata attaches only to claims available at the time of filing the original complaint:

> The scope of litigation is framed by the complaint at the time it is filed. The rule that a judgment is conclusive as to every matter that might have been litigated 'does not apply to new rights acquired pending the action which might have been, but which were not, required to be litigated.' Plaintiffs may bring events occurring after the filing of the complaint into the scope of the litigation by filing a supplemental complaint with leave of court, but there is no requirement that plaintiffs do so.

*Los Angeles Branch NAACP v. L.A. Unified School District,* 750 F.2d 731, 739 (9th Cir. 1984) (en banc) (citations omitted). As that court stated, "[w]e decline to impose a potentially unworkable requirement that every

---

listed parts, however, the court will not address the other minor components in its analysis.

**11.** Conversely, if Up–Right could demonstrate that the parts used in a particular head were

supplied *only* by American Grape, Up–Right would not be liable for infringement as regards that head.

claim arising prior to entry of a final decree must be brought into the pending litigation or lost." *Id.* at 739 n. 9.

In this case, the prior lawsuit was brought in 1985, at which time the Rotary Pulsators were just appearing on the market. Most of the heads at issue in this case had not even been built, and no claim of reconstruction could have been brought. Accordingly, the instant claim of reconstruction is not *res judicata.*

### B. *The Law of Reconstruction*

Controlling precedents make clear that the owner of a patented combination has the right to repair that combination, and that the owner does not have the right to reconstruct that combination. Those precedents, however, do not make nearly as clear the difference between the two.

The current United States Supreme Court opinion on the subject is *Aro Manufacturing Co. v. Convertible Top Company ("Aro I"),* 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592, *reh'g denied,* 365 U.S. 890, 81 S.Ct. 1024, 6 L.Ed.2d 201 (1961). In *Aro I,* the plaintiff was a manufacturer of automobile convertible tops. The patented combination consisted of the metal framework, mounting hardware, tonneau, and fabric covering. *Id.* 365 U.S. at 339 n. 2, 81 S.Ct. at 601 n. 2. The defendant was in the business of replacing the fabric when it became worn. The court found that this replacement did not constitute reconstruction, but rather permissible repair.

In so holding, the Court stated:

[R]econstruction of a patented entity, comprised of unpatented elements, is limited to such a true reconstruction of the entity as to in fact make a whole new article, after the entity, viewed as a whole, has become spent. In order to call the monopoly, conferred by the patent grant, into play for a second time, it must, indeed, be a second creation of the patented entity. Mere replacement of individual unpatented parts, one at a time, whether of the same part repeatedly or different parts successively, is no more than the lawful right of the owner to repair his property.

*Id.* at 346, 81 S.Ct. at 604 (quotations and citations omitted).

The Court also reaffirmed that, in analyzing whether an act of reconditioning rises to the level of reconstruction, the essential or nonessential nature of the replaced parts is of no consequence:

No element, not itself patented, that constitutes one of the elements of a combination patent is entitled to patent monopoly, however essential it may be to the patented combination and no matter how costly or difficult replacement may be. While there is language in some lower court opinions indicating that "repair" or "reconstruction" depends on a number of factors, it is significant that each of the three cases of this Court, cited for that proposition, holds that a licenses to use a patented combination includes the right "to preserve its fitness for use so far as it may be affected by wear or breakage." We hold that maintenance of the "use of the whole" of the patented combination through replacement of a spent, unpatented element does not constitute reconstruction.

*Id.* at 345–46, 81 S.Ct. at 604 (citations omitted).

Thus *Aro I* must be read as standing for the proposition that replacement of worn or broken parts, even repeatedly, does not rise to the level of reconstruction unless the patented combination, "viewed as a whole, has become spent."

This holding, however, does not fully answer the question of what would be a reconstruction. Put another way, how can one determine whether the article as a whole has been spent, if not by reference to whether some proportion of its individual parts are in fact worn or broken? In practice, an article becomes ripe for discarding or replacement for one of two reasons: Either it will have enough worn or broken parts that it is no longer economically rational to repair it, or it will have become obsolete due to advances in the art. In the instant case, only the former rationale would apply, as the FMC and Rotary Pulsator heads continue to represent the "state of the art."

Subsequent caselaw has addressed this issue in light of the *Aro* decision, adding some glosses to the law of reconstruction. While

those cases have addressed alleged reconstructions both minor and major, they have yet to find reconstruction.

In *Porter v. Farmers Supply Service, Inc.,* 790 F.2d 882 (Fed.Cir.1986), the court considered a relatively easy case: Whether replacement of worn, unpatented harvester disks in a tomato harvester constituted reconstruction. The disks in that case were the part that actually cut the soil, and wore out frequently.[12] They also represented a tiny proportion of the cost of the entire device. Thus in *Porter* there was no colorable argument that the patented harvester was "spent." In ruling that such replacement does not infringe the patent, the court noted that "courts have held almost uniformly that replacement of a worn part in a patented combination is repair rather than reconstruction." *Id.* at 886 (quotation and citations omitted).

At the other end of the spectrum lies *Dana Corp. v. American Precision Co., Inc.,* 827 F.2d 755 (Fed.Cir.1987). In that case, the plaintiffs sold patented heavy-duty truck clutches. The defendants sold replacement parts to two classes of rebuilders. The first class was "repair and return" rebuilders, which took in and disassembled worn clutches, replaced worn parts, reassembled the clutches, and returned them to the owner. The second class was "production rebuilders," who acquired traded-in clutches, disassembled them into their component parts, and reassembled and sold clutches from both salvaged and new parts. The court found that the method by which the clutches were rebuilt was immaterial; in either case,

> A rebuilder of a "spent" clutch would have to be "recreating" the clutch, and conversely, a rebuilder of a clutch that is not spent could not be recreating the clutch.

*Id.* at 759.

The *Dana* court considered and rejected a subjective economic analysis of when a clutch could be considered "spent":

> Offering an economic analysis as a substitute for what it perceives as an ad-hoc approach to the repair-versus-reconstruction question in the courts, Dana says the focus should be on "spentness," and that

whether the patented product is "spent" should turn on the owner's economic evaluation of the product, rather than on an examination of its physical characteristics. Dana says a patented product should be deemed "spent" when a user, making an objective [sic] economic decision, would replace the product rather than repair it, because it has no value to the owner except as scrap.

> Dana's approach is interesting, but unavailing, for it has the same degree of uncertainty Dana finds in the case law. In the present case, for example, truck owners desiring to keep their trucks on the road would desire a quick replacement of their inoperative clutch with an existing rebuilt clutch. That decision rests little, if at all, on the owner's objective view of the defective clutch's condition.... Until the Supreme Court or the Congress directs us to apply a different analysis, this court is bound to follow the guidelines laid down in *Aro I* and its progeny.

*Id.* at 760. Although the *Dana* court did not spell out those "guidelines," *Dana* seems to hold that the "spentness" of a product is to be determined by "examination of its physical characteristics," rather than consideration of the owner's subjective evaluation of value.

Thus, determination of whether the original patented combination has become spent must be made by reference to the physical condition of the combination taken as a whole. This was the approach of the court in *Automotive Parts Co. v. Wisconsin Axle Co.,* 81 F.2d 125, 127 (6th Cir.1935), which held that the determination:

> must depend in every case upon the special facts of the case as they show the relation of the two classes of parts—those supplied and those remaining in the original construction—to the patented unit.... Thus, if the new parts so dominate the structural substance of the whole as to justify the conclusion that it has been made anew, there is a rebuilding or reconstruction; and conversely, where the original parts, after replacement, are so large a part of the whole structural substance as to pre-

---

12. Approximately every six weeks.

ponderate over the new, there has not been a reconstruction but only repair.[13]

▇ Such an approach, while inevitably complex on a factual level, is not entirely unworkable in most instances. In the instant case, however, FMC does not argue that any Rotary Pulsators have in fact ever reached a state where, assessing them as a whole, they have required replacement of a majority of their parts in order to be returned to service. Rather, FMC argues that, although each individual servicing may in and of itself be only repair, over time a majority of the elements of Claim 1 have been replaced in most or all of the 192 Rotary Pulsators. The question thus becomes whether sequential repairs of broken or worn parts can, at some point, become an impermissible reconstruction, regardless of whether the entire combination, at any time, has become "spent".[14]

▇ This question has not yet been resolved in the caselaw. While *Aro* plainly states that the device, taken as a whole, must be spent before reconstruction can occur, that holding does not expressly require the spentness to occur at a single point in time. There is considerable intuitive appeal to the argument that, at some point, successive replacement of every part in a device will result in the creation of a new device for purposes of infringement.[15] This argument, however, seems to fly in the face of *Aro*'s statement that "[m]ere replacement of individual unpatented parts, one at a time, whether of the same part repeatedly or different parts successively, is no more than the lawful right of the owner to repair his property." A literal reading of this rule in extreme cases, of course, would permit indefinite extension of the life of a patented item

simply by the ruse of replacing one half of its parts one day, and the other half the next. Short of such extreme conduct, however, it seems clear that *Aro* requires that, at a minimum, the invention as a whole must at some specified time have outlived its usefulness and be ready for the scrapheap before there can be reconstruction. While the exact contours of this rule are vague, *Dana* establishes that the degree of spentness required is far beyond the facts of the instant case. The owners of the Rotary Pulsators have not sought to replace their entire heads systematically; rather, they have merely purchased and installed replacements for a relatively small number of parts that are particularly susceptible to wear and breakage.

To hold this routine repair work to be reconstruction would lead to the absurd result that an owner of an otherwise serviceable $30,000 picking head with a broken $200 rail is at some point faced with the choice of either (a) spending $30,000 to buy an entire new head or (b) spending $12,200 (the price of the part plus FMC's claimed royalty) to replace a simple part. FMC simply has not presented any evidence that could lead this court to the conclusion that the Rotary Pulsators in the field have in any sense become "spent," when viewed as a whole. Rather, they have merely established that, on average, owners of a $30,000 head have been spending roughly $900 per year to replace parts that have become worn or broken, rather than buying a new head. This is not a case at the outer margins of the repair/reconstruction doctrine. Rather, it is squarely within the right of the owner of a patented combination "to preserve its fitness for use so far as it may be affected by wear or

---

**13.** *See also Standard Havens Products, Inc. v. Gencor Industries, Inc.,* 953 F.2d 1360, 1376 (Fed.Cir.1991) ("The difference between a repair and a reconstruction is a difficult question that must be resolved case by case."); *Electric Auto-Lite Co. v. P. & D. Mfg. Co.,* 109 F.2d 566, 567 (1940) (L. Hand, A. Hand, and Chase, per curiam) ("in the nature of things there can be no rule as to where *repair* ends and *reconstruction* begins ...").

**14.** The determination of "spentness" is further complicated in this case, as the allegations concern all of the existing Rotary Pulsators. As a result, there is no "control group" with which to compare; we cannot look to other examples of

the device to determine the "normal" life expectancy absent the alleged repair/reconstruction. Up–Right urges comparison to FMC's own heads, which have been in the field upwards of ten years without replacement. However, FMC would of course have the right to reconstruct their own heads, and the relative lifespans, while informative, might be attributable to superior design.

**15.** At some point, the overhauled device will resemble the apocryphal axe, of which the owner brags: "This is my great-grandfather's original axe, although the handle has been replaced five times, and the head twice."

breakage." *Leeds & Catlin Co. v. Victor Talking Mach. Co.*, 213 U.S. 325, 336, 29 S.Ct. 503, 507, 53 L.Ed. 816 (1909). However one defines "spentness" of the combination taken as a whole, the Rotary Pulsators in this case have not been shown to be spent,[16] and thus no reconstruction has occurred.

### C. *Reconstruction Over Time*

Although the above analysis is sufficient to reach judgment in Up–Right's favor, an excess of caution leads the court to consider the alternate formulation of the repair/reconstruction doctrine urged by FMC. Even if the court were to accept FMC's argument that simple repair of broken or worn parts over time at some point rises to the level of reconstruction, FMC has not established that even a simple majority of the parts of the average Rotary Pulsator have been replaced. FMC at trial engaged in considerable "number crunching" in an attempt to establish that a preponderance of the Rotary Pulsators in the field were in fact predominately new. FMC's methodology, however, is seriously flawed. FMC used two approaches; the first is based upon counting elements of the claim, and the second on the dollar value of parts sold relative to the value of the entire head. We examine each approach in turn.

#### 1. Analysis by Number of Parts

■ The first approach is to identify certain replaced parts as comprising each of the individual elements of the claim, and then to average the degree to which each element had been replaced. Thus, FMC argues, the two rails, which had been replaced on average in every machine, counts as two elements, and the four C-arms, which had a 75% replacement rate, counted for two more. The entire drive means, by contrast, counts as only one element, as does the entire support means. Under this approach, the C-arms and rails count as two-thirds of the entire picking head, despite the fact that their combined retail price as individual parts

in 1992 dollars is $2400, compared with a retail price of the entire head of $30,000 in 1992 dollars.

The illogic of this approach is best illustrated by a hypothetical. Imagine a patent claim for an improved automobile engine that claims "a Chevrolet 457 engine, with six custom spark plugs." Under FMC's approach, replacing the six spark plugs would result in an eighty-five percent replacement rate of the entire device.

■ This approach of simply counting parts without regard to their relative values was rejected by the *Automotive Parts* case upon which FMC primarily relies:

> Every case, as we have said, must be decided on its special facts and circumstances. For example, there might be a structure where the putting in of a certain number of new parts would be "reconstruction," whereas the putting in of a smaller number would be "repair," *or even where the putting in of one new part would be reconstruction but the putting in of two or three would not be,* depending in each case upon whether, after the replacement, the structure as a whole could reasonably be said to be a new structure or the old one.

*Automotive Parts*, 81 F.2d at 125 (emphasis added). Rather, any analysis of whether the new predominates over the old must avoid the peril of assigning equal weight to every part, whether a single bolt or a massive structure. The analysis must be based not on the total number of parts but on their relative value.[17]

#### 2. Analysis by Value of Parts

■ FMC's second approach to the analysis purports to do just that.[18] However, in so doing FMC compares apples to oranges. FMC purports to demonstrate that the total parts sold represented 97% of the total cost of all Rotary Pulsators sold. FMC reaches

---

**16.** Testimony at trial revealed that the main housing weldment of one Rotary Pulsator had cracked, and that Pulsator had been removed from service rather than being repaired or reconstructed.

**17.** Analyzing replacement in this way is seriously flawed for another reason: Replacement parts

cost a lot more singly than the entire device. For example, if one sets out to build a car by buying the parts separately, by the time he has spent 50% of the list price of the car, he will have considerably less than half a car.

**18.** Plaintiff's exhibits 104 and 105 (easel-sized worksheets prepared at trial).

that figure by the following method. First, it takes $7,000 as the initial cost of the head. It then deducts 30% for labor ($2,100) and 20% for overhead ($1,400) to arrive at an original cost of $3,500 for the entire head.

On the parts side of the equation, FMC takes an annual parts figure of $250,000, multiplies it by 4.33 (representing the 52 months from settlement to trial), and then multiplies by 60% to remove retail profit margin. Dividing by 192 heads, this calculation yields a parts cost of $3,381 per head, or 97% of the total original cost.

This analysis is flawed in numerous respects. Most notably, it starts with a low figure for production cost, and then cuts it in half by removing both labor and overhead. By contrast, it starts with an excessive figure for parts sales (including common parts that did not go to Rotary Pulsators), and does not back out labor or overhead. It also bases parts sales on 1992 list prices, while basing Pulsator cost on pre–1988 prices.

If we are to assess parts sold as a percentage of total value of the head, there are two possible methods. Either we compare cost of manufacture of both, in 1992 dollars, or we compare list price of both, in 1992 dollars. Either method yields results below 50%.

### a. Cost Basis Comparison

Using the correct figures and methods, the cost basis comparison looks like this:

| | |
|---|---|
| Pulsator Cost, 1992 Dollars: (including labor and overhead) | $ 8,000.00 |
| Annual Parts Retail, 1992 Dollars: | $200,150.10 |
| Times 4.33 (52 months) | $866,649.93 |
| Times 60% (parts cost) | $519,989.95 |
| Parts per head: | $ 2,708.28 |
| Percentage Replaced: | 33.85% |

19. Annual times 4.33.

20. The necessity of limiting the calculation to 100% of the number of parts in the field is best illustrated by reference to the fact pattern in *Gillette Safety Razor Co. v. Standard Safety Razor Co.*, 64 F.2d 6 (2d Cir.1933). There, the patented combination was a safety razor, including the

This figure, moreover, is significantly overstated, as the parts sales figures include both parts that have been replaced more than 100% of the time, and common parts that to some extent did not find their way into Rotary Pulsators. It also ignores both the economies of scale in producing parts for initial manufacture, and the increased overhead attendant with inventorying and selling individual parts.

### b. Retail Price Comparison

If we compare retail to retail in 1992 dollars, the percentage is considerably smaller, due largely to the greater profit margin realized on the Rotary Pulsator:

| | |
|---|---|
| Retail price of head: | $ 30,000.00 |
| Annual retail price of parts: | $200,150.10 |
| Annual parts per head: | $ 1,042.44 |
| Annual percentage replaced: | 3.47% |
| Total percentage replaced: [19] | 15.02% |

By this measure, even if we deduct the $12,000 implied license paid by Up–Right per head, leaving a 1992 retail price of $18,000, the percentage is only 25.07% for the entire time period.

### c. Key Parts Comparison

Finally, we look at a sort of hybrid approach to these calculations, whereby instead of considering all parts of the head (on both the new side and the replacement side of the ledger), we look solely to the relative dollar amounts of the parts that were established at trial to be integral parts of Claim 1. The following figure compares original and replaced parts in the field based upon their list prices. In calculating these figures, we set an upper limit of 100% replacement of any individual part, as of course no Pulsator in the field can have more than, for example, two new rails at any time.[20]

blade. If, in a razor that sells for $5.00, the replacement blades cost 50 cents, counting more than 100% of the blades as replaced would lead to the conclusion that when the owner replaces his sixth blade, he has reconstructed the device, even though the razor in his hand is comprised of 90% original parts.

FIGURE 1: Key Parts Sales Relative to Parts Value

| PART | IN FIELD | PRICE | PRICE I.F. | SALES | SALES $ |
|------|---------:|------:|-----------:|------:|--------:|
| Left Rail | 192 | 205.91 | 39,534.72 | 192 | 39,534.72 |
| Right Rail | 192 | 205.91 | 39,534.72 | 192 | 39,534.72 |
| C–Arm | 768 | 503.66 | 386,810.88 | 510 | 256,866.60 |
| Rubber Mount | 1536 | 25.89 | 39,767.04 | 887 | 22,964.43 |
| Arm Bushing | 768 | 24.38 | 18,723.84 | 768 | 18,723.84 |
| Weight (top) | 384 | 522.74 | 200,732.16 | 3 | 1,568.22 |
| Weight (bottom) | 384 | 337.14 | 129,461.76 | 2 | 674.28 |
| Housing Weldment | 192 | 1,500.00 | 288,000.00 | 0 | 0.00 |
| Driveshaft Wldmnt | 192 | 241.94 | 46,452.48 | 168 | 40,645.92 |
| Crankshaft Wldmnt | 384 | 279.59 | 107,362.56 | 62 | 17,334.58 |
| Chain | 192 | 180.09 | 34,577.28 | 192 | 34,577.28 |
| Lower arm socket | 768 | 12.50 | 9,600.00 | 70 | 875.00 |
| Pivot Arm Wldmnt | 768 | 60.00 | 46,080.00 | 9 | 540.00 |
| Motor | 192 | 441.73 | 84,812.16 | 18 | 7,951.14 |
| TOTALS: | | | 1,471,449.60 | | 481,790.73 |

Percentage Replaced:  32.74%

KEY:
"IN FIELD" = total number of parts in 192 heads.
"PRICE" = 1992 price per part.
"PRICE I.F." = Price × In Field.
"SALES" = Total Unit Sales (limited to 100%).
"SALES $" = Unit Sales × Price.

Thus by this method of calculation, the average Rotary Pulsator in the field has had only 32.74% of its original parts replaced, even if we adopt FMC's narrow reading of which parts comprise the elements of the patent claim. As FMC's reading concentrates on the most frequently replaced parts, this percentage is correspondingly higher than under a broader reading that would include the myriad other parts that comprise a Rotary Pulsator.

In sum, therefore, even if we were to accept *both* that sequential replacement of worn or broken parts can be reconstruction, *and* that only the parts listed in Figure 1 are to be counted as part of the patented combination, a methodologically rigorous analysis of the facts before the court reveals that the repairs in question have replaced less than a third of the patented combination. Under any reasonable method of comparison, there has been no reconstruction, and thus no contributory infringement.[21]

D. *Summary of Conclusions of Law*

■ The court concludes, therefore, that replacement of worn or broken parts, including the same parts repeatedly and different parts at different times, constitutes permissible repair, unless the patented combination, viewed as a whole, is at the time of the repair "spent," based upon an objective comparison of the proportion of original to replaced parts. *Aro Manufacturing Co. v. Convertible Top Company ("Aro I")*, 365 U.S. 336, 81 S.Ct. 599, 5 L.Ed.2d 592, *reh'g denied*, 365 U.S. 890, 81 S.Ct. 1024, 6 L.Ed.2d 201 (1961); *Dana Corp. v. American Precision Co., Inc.*, 827 F.2d 755 (Fed.Cir.1987); *Porter v. Farmers Supply Service, Inc.*, 790 F.2d 882 (Fed.Cir.1986); *Automotive Parts Co. v. Wisconsin Axle Co.*, 81 F.2d 125, 127 (6th Cir.1935).

FMC has not established by a preponderance of the evidence that any of the Rotary Pulsators in question has at any time become "spent." Moreover, even if the court were to discard the requirement that the combination in question be spent, all of the parts sold by

21. This analysis does not address the question of whether substantial non-infringing uses exist for the parts sold. Although this issue was raised orally at trial, it was not briefed, and does not affect the outcome in this case; accordingly, the court does not reach it. A fortiori, as the court finds no infringement, we do not reach the issue of willfulness.

both Up–Right and American Grape combined would not predominate over the original parts remaining. As such, Up–Right's customers have merely exercised the right of the owner of a patented combination "to preserve its fitness for use so far as it may be affected by wear or breakage." *Leeds & Catlin Co. v. Victor Talking Mach. Co.*, 213 U.S. 325, 336, 29 S.Ct. 503, 507, 53 L.Ed. 816 (1909). There has been no reconstruction.

### III. CONCLUSION

In accordance with the foregoing findings of fact and conclusions of law, the court finds that judgment shall enter in favor of defendant Up–Right and against plaintiff FMC.

IT IS SO ORDERED.